IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES FINN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:13-cv-862 |
| v. | ) | |
| | ) | Judge Trauger |
| DEAN TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT DEAN TRANSPORTATION, INC'S
## MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

*/s/ Chris R. Pace*
Chris R. Pace (MO 47344), *Admitted Pro Hac*
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4520 Main Street
Suite 400
Kansas City, MO 64111
(816) 410-2232 Phone
(816) 471-1303 Fax
Chris.pace@ogletreedeakins.com

Jonathan O. Harris (BPR No. 21508)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
SunTrust Plaza, Suite 1200
401 Commerce Street
Nashville, TN 37219
Telephone: (615) 254-1900
Facsimile: (615) 254-1908

**ATTORNEYS FOR DEFENDANT**

i

# TABLE OF CONTENTS

I.   Introduction ........................................................................................................... 1

II.  Brief Summary of Uncontroverted Facts ............................................................. 1

III. Argument ................................................................................................................ 2

    A.  Plaintiff Was Exempt Under the MCA Exemption to the FLSA. ................................. 2

        1.  Plaintiff's Driving Activities Readily Qualify as "Interstate" Under DOT's Jurisdictional Standards. ................................................................................. 3

        2.  The Transportation At Issue Here Qualifies as Interstate Under the Superseded Standards Effective When *Baird* Was Issued. ..................................... 10

    B.  Plaintiff Was An Exempt Executive or Administrative Employee ............................... 12

        1.  Plaintiff Was Properly Classified Under the Executive Exemption ..................... 12

        2.  Plaintiff was Properly Classified as Exempt Under the Administrative Exemption ........................................................................................................ 20

IV. Conclusion .............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advantage Tank Lines, Inc.,*
   No. MC-C-30198, 10 I.C.C.2d 64 (1994) ................................................................4

*Baird v. Wagoner,*
   425 F.2d 407 (6th Cir. 1970) ................................................................... passim

*Ballou v. DET Distrib. Co.,*
   2006 WL 2035729 (M.D. Tenn. July 17, 2006) .......................................4, 9

*Beauchamp v. Flex–N–Gate, LLC,*
   357 F.Supp.2d 1010 (E.D.Mich. 2005) ..................................................17

*Collins v. Heritage Wine Cellars,*
   589 F.3d 895,899-900 (7th Cir. 2009) ....................................................8

*Foreman v. Five Star Food Serv.,*
   2013 WL 5975899 (M.D. Tenn. Oct. 18, 2013 .......................................5, 9

*Foreman v. Five Star Food Service,*
   Case. No. 3:11-cv-01124, Doc. 46, 2013 WL 3187081, and Doc. 81,
   2013 WL 5675899 ........................................................................2, 6, 9, 10

*Foxworthy v. Hiland Dairy Co.,*
   997 F.2d 670 (10th Cir. 1993) ............................................................10

*Galbreath v. Gulf Oil Corp.,*
   413 F.2d 941 (5th Cir. 1969) ............................................................3, 4

*Henry v. Quicken Loans, Inc.,*
   698 F.3d 897 (6th Cir. 2012) ............................................................21

*Horn v. Digital Cable & Comms.,*
   2008 WL 7137186 (N.D. Ohio June 12, 2008) ....................................5, 8, 9

*Keeton v. Flying J, Inc.,*
   429 F.3d 259 (6th Cir. 2005) ............................................................18

*Kollstedt v. Princeton City Schools Bd. of Education,*
   2011 WL 249496 (S.D.Ohio Jan. 26, 2011) ..........................................23

*McCall v. First Tennessee Bank National Association*
   2014 WL 2159007, at *9 ..........................................................16, 17, 18

*Mena v. McArthur's Dairy,*
   352 Fed. Appx. 303, 2009 WL 3004009 (11th Cir. 2009) ...............................................5, 10

*Morris v. McComb,*
   332 U.S. 422 (1947) ...............................................................................................3

*Musarra v. Digital Dish, Inc.,*
   454 F.Supp.2d 692 (S.D. Ohio 2006) ..................................................................... 2, 5, 8

*Petit v. Dale Adams Enterprises,*
   2014 WL 1874217 (N.D.Ohio May 8, 2014) ........................................................ 17, 20

*Roberts v. Dolgencorp, Inc.,*
   2010 WL 4806792 (M.D.Tenn. Nov. 18, 2010) ................................................... 13, 18

*Schmidt v. Peoples Telephone Union,*
   138 F.2d 13 (8th Cir. 1943) ..................................................................................3

*Shew v. The Southland Corp.,*
   370 F.2d 376 (5th Cir. 1966) ..............................................................................10

*Southland Corp. v. Shew,*
   248 F.Supp.2d 12 (N.D. Tex. 1965) .....................................................................3

*Thomas v. Speedway SuperAmerica, LLC,*
   506 F.3d 496 (6th Cir. 2007) ........................................................................passim

**STATUTES**

29 U.S.C. § 213(a)(1) ...............................................................................................12

29 U.S.C. § 213(b)(1) ..............................................................................................1, 3

49 U.S.C. § 13102(15) ...............................................................................................3

Fair Labor Standards Act (FLSA) .................................................................................1

FLSA ..................................................................................................................passim

FLSA 2005-10 .......................................................................................................7

**OTHER AUTHORITIES**

21 C.F.R. § 1.326(a) ..................................................................................................6

21 C.F.R. § 1.352 ......................................................................................................6

29 C.F.R. § 541.100 .............................................................................................12, 20

29 C.F.R. § 541.100(a) .............................................................................................19

Case 3:13-cv-00862    Document 26    Filed 07/03/14    Page 4 of 30 PageID #: 98

29 C.F.R. § 541.100(a)(3) ..................................................................... 18

29 C.F.R. § 541.105 ..................................................................... 18, 19

29 C.F.R. § 541.106 ..................................................................... 20

29 C.F.R. § 541.200(a)(1)-(3) ..................................................................... 21

29 C.F.R. § 541.200(a)(2) ..................................................................... 21

29 C.F.R. § 541.202(a) ..................................................................... 21, 22

29 C.F.R. § 541.202(b) ..................................................................... 22

29 C.F.R. § 541.602(b) ..................................................................... 12

29 C.F.R. § 541.700 ..................................................................... 20

29 C.F.R. § 541.700(a) (2014) ..................................................................... 13, 14, 21

29 C.F.R. § 541.700(b) ..................................................................... 16

29 C.F.R. § 541.708 ..................................................................... 24

69 Fed. Reg. at 22122, 22136–37, 22185–87 (2004) ..................................................................... 16

Available at http://www.dol.gov/whd/FOH/FOH_Ch24.pdf ..................................................................... 3

Available at
    http://www.dol.gov/whd/opinion/FLSA/2005/2005_01_11_10_FLSA_IntraInterstate
    .pdf ..................................................................... 7

http://www.stb.dot.gov/stb/public/resources_icc.html ..................................................................... 2

Local Rule 56.01(b) ..................................................................... 1

MC No. 207, 8 I.C.C.2d 470 (1992) ..................................................................... 4, 5, 6

No. MC-48, 71 M.C.C. 17 (1957) ..................................................................... 4

DOL Field Operations Handbook §24c06 ..................................................................... 3

Defendant Dean Transportation, Inc. moves this Court for an Order granting it summary judgment on all of Plaintiffs' claims.  In support of this Motion, Defendant offers the Court the following Memorandum.

## I.      Introduction

Plaintiff James Finn was one of Defendant's Route Sales Supervisors responsible for directing the work of more than ten full time employees who used commercial motor vehicles to deliver dairy products, many of which were manufactured outside of Tennessee, to retailers, restaurants and schools in the Nashville area.  At all times relevant to this case, Plaintiff's duties qualified him as exempt from the overtime provisions of the Fair Labor Standards Act (FLSA) under the "executive" and "administrative" exemptions.[1]  Starting in 2011, a labor shortage required Plaintiff to fill in for absent drivers on many of his work days, in addition to performing supervisory responsibilities (SOFs 69-71)[2].  Plaintiff's lawsuit is premised upon his assertion that he lost his exempt administrative and executive status at this point because, he claims, his primary duty changed to driving a commercial motor vehicle.  While the uncontroverted facts show that this is not true, even if it was, Plaintiff's operation of a commercial motor vehicle in interstate commerce rendered him exempt from the overtime provisions of the FLSA under the motor carrier act (MCA) exemption, 29 U.S.C. § 213(b)(1).

## II.     Brief Summary of Uncontroverted Facts[3]

Plaintiff Jim Finn regularly drove a commercial motor vehicle to deliver highly perishable dairy products to retail customers, with which it had standing agreements to fulfill all of their needs for Purity dairy products, in and around the Nashville area.  (SOFs 4, 6, 8, 9).  Defendant obtains a

---

[1] As discussed in detail in the text, *infra*, Defendant also characterized Plaintiff as exempt from the overtime provisions of the FLSA under the Motor Carrier Exemption, 29 U.S.C. § 213(b)(1).

[2] Citations in this document to "SOF" refer to the paragraph of Defendant's Statement of Uncontroverted facts, filed contemporaneously with this Memorandum.

[3] In compliance with Local Rule 56.01(b), Defendant has separately submitted its Statement of Undisputed Facts, but further summarizes elements of that statement here.

1

significant percentage of these products directly from out-of-state manufacturers with the intention of delivering them to existing customers. (SOFs 22, 32). These products are ordered based upon assessments of customer need derived from historical sales data and delivered to Defendant's Nashville temporary refrigerated storage facility (the "cooler"), usually on Defendant's own trucks. (SOF 21, 28). The products stayed in the cooler for as little as one day (and an average of eight days) before being delivered to the customer. (SOF 29).

## III.    Argument

This case does not present a close call. For over 20 years, the Department of Transportation, Department of Labor, and courts have found that employees like Plaintiff, who deliver loads of products that include those made out of state to customers with which their employer has an existing, standing agreement to supply all of their needs, readily qualify for the MCA exemption. The Court should grant summary judgment.

### A.    Plaintiff Was Exempt Under the MCA Exemption to the FLSA.

The Sixth Circuit last addressed the MCA exemption in *Baird v. Wagoner,* 425 F.2d 407 (6th Cir. 1970).[4] Despite the passage of time, and the intervening development of seemingly contrary jurisprudence, *Baird's* twin foundations remain good law: First, *Baird* teaches that employees who "are within the [Interstate Commerce] Commission's power, as defined in the MCA . . . are exempted from the maximum hours provisions of the FLSA and not entitled to recovery for overtime." 425 F.2d at 410. Second, *Baird* obligates courts to give "great weight" to the DOT's[5] own assessment of when employees who transport products exclusively *intra*state fall within its

---

[4] This Court recently has had ample opportunity to explore the continuing vitality of *Baird. See Foreman v. Five Star Food Service,* Case. No. 3:11-cv-01124, Doc. 46, 2013 WL 3187081, and Doc. 81, 2013 WL 5675899.

[5] Various components of the Department of Transportation, primarily the Surface Transportation Board and the Federal Motor Carrier Safety Administration, have absorbed the regulatory functions of the Interstate Commerce Commission (ICC), which was abolished in 1995. *See* http://www.stb.dot.gov/stb/public/resources_icc.html. However, courts continue to cite ICC rulings as authoritative and, in fact, often refer to the ICC in the present tense. *See, e.g., Musarra v. Digital Dish, Inc.,* 454 F.Supp.2d 692, 706 (S.D. Ohio 2006).

2

jurisdiction, and hence qualify for the MCA exemption. *Id.* at 412.[6] Because Plaintiff easily falls within DOT's jurisdictional principles, the Court should grant summary judgment for Defendant.

### 1. Plaintiff's Driving Activities Readily Qualify as "Interstate" Under DOT's Jurisdictional Standards.

The FLSA exempts employees from its overtime provisions if the Secretary of Transportation has the power to establish their qualifications and maximum hours of service. 29 U.S.C. § 213(b)(1). The Secretary has this authority over safety-effecting employees (including drivers) of "motor carriers" and "motor private carriers"[7] when those employees transport property in interstate commerce. This authority, and the consequent exemption from the overtime provisions of the FLSA, exists even if the property being transported interstate is comingled with *intra*state products and regardless of the relative amount of product being transported interstate. *See Morris v. McComb,* 332 U.S. 422, 431-32 (1947)(employees exempt under MCA even though only 4% of shipments involved goods originating in or destined for another state); *Schmidt v. Peoples Telephone Union,* 138 F.2d 13, 15 (8th Cir. 1943)(the "amount or percentage of revenue derived by the employer from interstate [business]" is not determinative). *See also Southland Corp. v. Shew,* 248 F.Supp.2d 12, 15 (N.D. Tex. 1965)("The fact that out of state [dairy products] are mixed with intrastate goods is not decisive. . . ."); DOL Field Operations Handbook §24c06[8] (exemption applies if "some portion of a particular load is moving in interstate commerce"). Instead, the dispositive question is whether those goods that were manufactured out of state were in a state of "continuous movement," as defined under the MCA,[9] to their final destination. *Baird,* 425 U.S. at 410.

---

[6] As discussed in the text below, this is particularly true where, as here, the DOT and Department of Labor construe the FLSA and the MCA consistently. *Baird,* 425 F.2d at 411.

[7] A "motor private carrier" includes entities like Defendant, which transport property belonging to the carrier that is being transported for sale. 49 U.S.C. § 13102(15).

[8] Available at http://www.dol.gov/whd/FOH/FOH_Ch24.pdf , last accessed 6.21.2014.

[9] While it is generally true that exemptions to the FLSA are narrowly construed because the FLSA is a remedial statute, "the MCA is likewise a remedial statute and should [] be broadly construed." *Galbreath v. Gulf Oil Corp.,* 413 F.2d 941 (5th Cir. 1969). Nothing suggests that, "as between two remedial statutes, each entitled to a broad construction, one should be narrowly construed merely because its coverage was made exempt under the

3

To answer this dispositive question, courts in this Circuit assess the shipper's intent *using* the DOT's own jurisdictional standards. *Baird,* 425 F.2d 410-11. In 1970, the *Baird* court found that guidance in *Determination of Jurisdiction Over Transportation of Petroleum and Petroleum Products By Motor Carriers Within a Single State*, Ex Parte No. MC-48, 71 M.C.C. 17 (1957) (copy attached as Ex. 1). However, in a series of decisions in the 1980s and 1990s, the DOT "repudiated" this guidance, and several courts of appeal upheld this repudiation. *See Advantage Tank Lines, Inc.*, No. MC-C-30198, 10 I.C.C.2d 64, 66-67 (1994)(compiling cases)(copy attached as Ex. 2). DOT then issued a policy statement detailing the factors it would consider when determining whether intrastate transportation of products manufactured out of state falls within its jurisdiction. *Policy Statement—Motor Carrier Interstate Transportation—From Out-of-State Through Warehouses To Points in The Same State,* Ex Parte MC No. 207, 8 I.C.C.2d 470 (1992)(copy attached as Ex. 3)(MC-207).[10] In the more than 22 years following the issuance of this guidance, DOT has used this "totality of the circumstances" approach to guide its jurisdictional determinations. Application of those factors, excerpted and discussed below, compels summary judgment for Defendant.

> **Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped . . . on customer demands that have some factual basis. . . . The factual basis for projecting customer demand may include, but is not limited to, historic sales [and] relevant market surveys.**

8 I.C.C.2d at 473. There is no dispute in this case that Defendant bases its orders of out of state goods on the aggregated historical sales data for all of its customers in the Nashville area (SOF 21). This forecast is highly precise, resulting in less than 1.5% customer returns, and is very similar to the systems of projecting customer need that support the MCA exemption in every recent district court case within this Circuit that has addressed this question. *See, e.g., Ballou v. DET Distrib. Co.,* 2006 WL

---

other." Id. (citations omitted). Notably, the Sixth Circuit generally approves of *Galbreath*, citing it in *Baird* for the proposition that the FLSA's coverage provisions are broader than the MCA exemption. 425 U.S. at 410.

[10] Defendant takes seriously *Baird's* direction to attach "great weight" to the DOT's determinations of its own jurisdiction, particularly where both the DOL and DOT agree. Consequently, Defendant begins its analysis with the most recent articulation of the factors DOT uses to define interstate commerce. However, as explained *infra,* Plaintiff would qualify for the MCA exemption under the older standard set out in MC-48 discussed in *Baird.*

4

2035729, at *10 (M.D. Tenn. July 17, 2006); *Musarra v. Digital Dish, Inc.,* 454 F.Supp.2d 692, 707 (S.D. Ohio 2006); *Horn v. Digital Cable & Comms.,* 2008 WL 7137186, at *4 (N.D. Ohio June 12, 2008)(determination of quantity product based on "anticipated customer demands" sufficient); *Foreman v. Five Star Food Serv.,* 2013 WL 5975899, at *3 (M.D. Tenn. Oct. 18, 2013)("Foreman II")(use of "targeted forecasting to estimate [] customer needs" one of several factors that, if true, would support MCA exemption).   And this process is essentially identical to that used by Defendant's sister company, McArthur's Dairy,[11] which the 11th Circuit found to support the MCA exemption.  *Mena v. McArthur's Dairy,* 352 Fed. Appx. 303, 2009 WL 3004009, at *8-9 (11th Cir. 2009)(ordering based on projection of customer's needs as discerned through past purchases sufficient to sustain exemption).   This factor strongly supports the application of the MCA exemption.

> ***No processing or substantial product modification of substance occurs at the warehouse or distribution center.***

8 I.C.C.2d at 473.  Defendant neither repackages nor modifies any of the out-of-state products at issue in this case (SOF 23).  This factor favors a finding of DOT jurisdiction.

> ***While in the warehouse, the merchandise is subject to the shipper's control and direction as to subsequent transportation*** **and** ***the warehouse is owned by the shipper.***

8 I.C.C.2d at 473.   Defendant controls the out-of-state products throughout their journey. Defendant takes ownership of the product at the point of manufacture and then ships products on its own trucks or, in a minority of cases, on a third-party carrier contracted by Defendant (SOFs 24-26).   Upon their arrival in Nashville, they are maintained in the cooler, which is owned by

---

[11] McArthur, like Purity, is a member of the Dean Foods family of companies.  *See Mena,* 352 Fed. Appx. At 304.

Defendant's corporate parent,[12] and shipped to their final destination on Defendant's vehicles (SOFs 25, 28, 32-34).

> **Modern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse.**

8 I.C.C.2d at 473. As a company that manufactures, transports and delivers food in the United States, Defendant is subject to Food and Drug Administration regulations regarding the establishment and maintenance of inventory records. *See* 21 C.F.R. § 1.326(a). These regulations require Defendant to track products' entry and exit from the cooler. *See* 21 C.F.R. § 1.352. Defendant meets this obligation through the use of SERTI, an automated inventory control system that allows Defendant to track products by lot number and expiration date (SOF 31.) Each of these factors underscore the interstate nature of the shipments at issue in this case. But the ICC has also issued guidance on factors that do *not* undermine a finding of interstate commerce, one of which is particularly salient here. DOT notes that the "shipper's lack of knowledge of the specific, ultimate destination . . . at the time the shipment leaves its out-of-state origin" does not negate the interstate nature of the shipment.[13] *Id.* In this case, Defendant knows at the time it places its order for out of state product that it is destined for its existing customers with whom it has agreements to provide all of the dairy products the customers designate (SOFs 9, 21), but it does not know, for example, where any one bottle of product may ultimately be delivered. This lack of specificity does not undermine the exemption. *Id.*[14]

---

[12] This Court has recognized previously that various members of the same corporate family can participate in the transport process without breaking the chain of interstate commerce. *See Foreman v. Five Star Food Servs., Inc.,* 2013 WL 3187081 (M.D. July 24, 2013), rev'd on other grounds by *Foreman v. Five Star Food Serv.*, 2013 WL 5675899, ___ F.Supp.2d ___, (M.D. Tenn. Oct. 18, 2013). Regardless, DOT has specifically held that use of a warehouse that is not owned by the shipper to store product before final delivery does not break the chain of interstate commerce. 8 I.C.C.2d at 474.

[13] DOT actually mentions this factor twice in MC-207. First, it states it positively, as a factor that supports the extension of DOT jurisdiction over the in-state leg of a product's journey. 8 I.C.C.2d at 473. Second, it reinforces the notion that the shipper's lack of knowledge about the precise destination of a product at the time of order is not a factor that undermines the exemption. *Id.* at 474.

14 Notably, DOT does not find that a lack of time limitations on storage undermines its jurisdiction. 8 I.C.C.2d at 473. Of course, even if it did, the uncontroverted evidence shows that the dairy products at issue in this case stay in the Cooler for a very short period of time before they are delivered to the customer.

6

This case is not a close call. The drivers of Defendant's local delivery vehicles clearly fall within the DOT's jurisdiction, and, therefore, are exempt. But the fact that DOL and the DOT agree on exemption in these circumstances provides an additional, compelling reason to grant Defendant's motion. In *Baird,* the Sixth Circuit noted:

> The United States Supreme Court has held that where the United States Department of Labor and the Interstate Commerce Commission construe the FLSA and the MCA consistently, their construction 'is entitled to great weight.' *Boutell v. Walling*, 327 U.S. 463, 471, 66 S.Ct. 631, 90 L.Ed. 786 (1946) (involving prior consistent agency interpretation of 13(b)(1). *See United States v. American Trucking Association*, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

*Baird,* 425 F.2d at 411. That is precisely the case here. After DOT issued MC-207, DOL issued FLSA 2005-10.[15] Noting that "DOT is the final administrative authority for the MCA" and that "its interpretation of its jurisdiction is controlling," DOL announced that MC-207, as the most recent articulation of the factors used to assess DOT jurisdiction, would be used to assess application of the MCA exemption in future matters. *Id.* Applying these factors, DOL found that drivers who delivered petroleum products obtained at an in-state terminal to local customers were involved in a "practical continuity of movement" of goods through interstate commerce and, therefore, exempt. *Id.* There is no principled distinction between the facts the DOL considered in FLSA 2005-10 and those present here; the court should grant summary judgment.

This Court need not ignore *Baird* or conclude that it has been implicitly superseded to apply the DOT's own jurisdictional standards in this case. To the contrary, the most faithful interpretation of *Baird's* direction to assign "great weight" to DOT and DOL's interpretations of the application of the MCA exemption requires the Court to look to the agencies' current regulatory guidance, which has evolved since 1957 to reflect the modern state of industry. While the Sixth

---

15 Available at http://www.dol.gov/whd/opinion/FLSA/2005/2005_01_11_10_FLSA_IntraInterstate.pdf , last accessed May 23, 2014.

Circuit has not yet had opportunity to revisit this question, district courts within the Sixth Circuit have, and they have applied standards consistent with those outlined in MC-207.[16]

In *Musarra v. Digital Dish, Inc.,* the defendant received out-of-state shipments of satellite television equipment from its parent company, Dish Network, which it then stored in an Ohio warehouse. 454 F.Supp.2d 692, 695. Dish Network shipped this equipment based upon an estimate of the service needs of its customers. 454 F.Supp.2d at 713. Upon arrival, the equipment remained in the warehouse for ten or fewer days. *Id.* The plaintiffs, satellite installation technicians who drove to customer sites exclusively in Ohio, then stocked their trucks from this inventory only after they received orders for specific installation jobs. *Id.* at 698. On the parties' cross motions for summary judgment regarding the MCA exemption, the court noted that the 1957 ICC guidance upon which the *Baird* court relied had been updated by MC-207 and *Advantage Tan Lines* and that DOL had issued guidance incorporating these updated guidelines. 454 F.Supp.2d at 708-09. Holding that MC-207 contained the current standards for assessing DOT jurisdiction, the court engaged in a detailed analysis of the MC-207 factors, rejecting the suggestion that the failure to have specific customer orders at the time of shipment and the multi-day stay in a warehouse before final delivery undermined the exemption, the court denied the plaintiffs' motion and granted defendant's. *Id.* at 711-719.

Similarly, in *Horn v. Digital Cable & Comms.,* 2008 WL 7137186 *4 (N.D. Ohio 2008), the court applied the MC-207 factors to find that cable installation technicians who drove a vehicle

---

16 In *Collins v. Heritage Wine Cellars,* 589 F.3d 895,899-900 (7th Cir. 2009), the 7th Circuit deemed the criteria within MC-207 "complicated" and criticized the guidance for not assigning any weighting among the criteria. Nevertheless, the court found that four of the factors "ma[de] sense" and supported the MCA exemption in that case. *Id.* While it is true that MC-207 embraces a totality of the circumstances framework, rather than one that imparts specific weight to various criteria, it is equally true that Baird attaches "great weight" to DOT interpretations of its own jurisdiction. Consequently, while the Seventh Circuit may prefer a different formulation, courts in the Sixth Circuit must defer to the DOT's own jurisdictional criteria, regardless of their lack of weighting.

exclusively within one state to install equipment that had been ordered from out of state based on "anticipated customer demands" were exempt from the overtime provisions of the FLSA.[17]

In *Ballou v. DET Distributing Co.,* 2006 WL 2035729 (M.D. Tenn. July 17, 2006), several Route Sales Supervisors for a beer wholesaler, which shipped product made outside the state to its local warehouse for delivery to retail liquor stores, asserted that they were improperly characterized as exempt. As is the case here, shipments in *Ballou* were made based on a "forecasting system" and transportation to the final customer occurred only after receipt of product from out of state. While the *Ballou* court did not invoke MC-207 by name, it did engage in analysis similar to that found in the DOT guidance, specifically noting that the lack of precise by-customer orders at the time the product is shipped from out-of-state did not undermine the MCA exemption. 2006 WL 2035729 at *12. Noting that the beer was intended to be distributed to pre-exiting customers at the time that it was ordered, the court found that it remained in a continuous stream of commerce to its final destination and sustained the MCA exemption. *Id.*

Finally, each of the district court decisions discussed above is consistent with the framework this Court recently outlined in *Foreman II,* 2013 WL 5675899 (M.D. Tenn. Oct. 18, 2013). In *Foreman II,* the Court reconsidered an earlier denial of the defendant's motion for summary judgment when the defendant submitted a more fulsome factual record. While the Court did not specifically reference MC-207 in its decision, it did identify several factors that, if proven true, "provide[] seemingly compelling evidence that, regardless of whether the court strictly applies the *Baird* factors," would support the application of the exemption in that case. 2013 WL 5675899 at *3. Comparison of the *Foreman* facts with those in evidence here illustrates that this matter presents an even stronger case for summary judgment than that found in *Foreman.*

---

17 In 2005, Congress narrowed the definition of "commercial motor vehicle" in the Motor Carrier Act to those vehicles with a gross vehicle weight rating of 10,001 or more pounds, that transported a specific number of passengers, or that transported hazardous materials. *Horn,* 2008 WL 7137186 at *7-8. The *Horn* court denied the defendant's motion for summary judgment as to claims arising after this amendment because the defendant failed to offer evidence of the weights of the vehicle in question. Here, however, there is no dispute that Plaintiff operated a commercial motor vehicle with a gross vehicle weight rating in excess of 10,000 pounds (SOF 4).

9

In *Foreman,* the defendant received much of its out of state product from a distributor located within Tennessee, Vistar,[18] *and* received only "*some* products directly from out-of-state vendors" without those products having first been routed through wholesales. *Id.* at *3 (emphasis supplied). Here, by contrast, Defendant's out-of-state products are obtained directly from the manufacturer and shipped by Defendant itself, or by carriers contracted by Defendant (SOFs 24-26).

In *Foreman,* the defendant received some specialized goods from a "pass through" entity that obtained products from out-of-state. *Id.* Again, in this case, products are ordered directly from out-of-state manufacturers.

In *Foreman,* the defendant utilized a "targeted forecasting" process to "estimate" its customers' needs. Here, Defendant utilizes essentially the same type of system (SOF 21).

Finally, in *Foreman,* the Court noted that inventory of Five Star's in-state distributor, Vistar, turned over, on average, "within 27 to 28 days." Here, Defendant's out-of-state products turns over, on average, once every eight days, and this includes out-of-state water products that have longer expiration dates than many of the dairy products Defendant sells (SOF 29). Indeed, for several of its products (e.g. Milo's Sweet Tea and Tropicana orange juice), Defendant has only a one to three-day supply of product on hand (*Id.*).[19]

Each of these cases supports the application of the MCA exemption to this matter. But even if the Court were to ignore these cases, and the MC-207 factors upon which they expressly or implicitly rely, it should still grant summary judgment to Defendant.

### 2. The Transportation At Issue Here Qualifies as Interstate Under the Superseded Standards Effective When *Baird* Was Issued.

---

18 This fact is set out in Doc. 51 in case number 3:11-cv-01124, Declaration of Mark Stephanos.

19 The approaches used to determine the application of the MCA exemption by district courts of the Sixth Circuit are in accord with courts around the country that have utilized similar analysis over the last 40 years to find that drivers for dairies that receive out of state product for delivery to local grocery stores and convenience stores are exempt under the MCA exemption. *See, e.g., Mena v. McArthur's Dairy,* 352 Fed.Appx. 303 (11th Cir. 2009)(finding that drivers for Defendant's sister company in Florida were exempt under the MCA exemption); *Foxworthy v. Hiland Dairy Co.,* 997 F.2d 670, 673 (10th Cir. 1993)(applying MCA exemption, in part, because arrangement between dairy and customers was similar to requirements contract); *Shew v. The Southland Corp.,* 370F.2d 376 (5th Cir. 1966).

10

The central holding of *Baird* remains good law: the MCA exemption applies when DOT has jurisdiction and the court should reference DOT (and DOL) guidance to determine whether DOT has that jurisdiction. Both DOT and DOL jurisdictional standards have evolved since the Sixth Circuit's 1970 decision and nothing in *Baird* suggests that the Court should ignore this evolution. But, even if this Court were to disregard MC-207 and instead apply the MC-47 standards that were in effect when *Baird* was decided, it would find that Plaintiff is exempt.

The *Baird* court noted that the defendant in that case did not make transportation arrangements for local delivery until *after* an order was placed by a customer of Standard Oil. *Baird,* 425 F.2d at 411-12. Here, by contrast, Defendant's drivers drive regular routes[20] without awaiting receipt of an "actual order" by its own customers.[21] Additionally, the *Baird* court noted that Standard Oil had not entered into "requirements contracts" with customers before shipping product to the in-state terminal. *Id* at 412. Here, by contrast, Defendant has requirements agreements with all of its customers whereby Defendant is responsible for meeting *all* of its customers' needs for the Dean products the customers agree to carry. Next, the *Baird* court noted that Standard Oil comingled product shipped from out of state with local purchases when necessary to meet demand. *Id.* Here, Defendant purchases out-of-state goods directly from out-of-state manufacturers.

A close reading of *Baird* requires the Court to apply the factors the DOT has used to assess its jurisdiction over interstate shipments for the last 20 years. Plaintiff is plainly exempt under these factors, but he is also exempt under the older factors that defined DOT's jurisdiction when the Sixth Circuit issued *Baird* in 1970. The Court should grant Defendant's motion for summary judgment.

---

20 During discovery, Plaintiff focused closely on the fact that one of Defendant's employees sold product to local vendors, mostly food trucks, directly from a stationary truck located at the Nashville facility. It is undisputed, however, that Plaintiff never performed this function (See SOFs 45,50). Additionally, these sales constitute less than 1% of Defendant's Nashville area sales, and no more than .45% of the sales of out-of-state products in the Nashville area (SOF 40). Finally, while it is irrelevant to Plaintiff's claims in this case, the employee who makes these sales from the stationary truck is not deemed to be exempt from the overtime provisions of the FLSA (SOF 37).

21 Notably, the defendant in Baird was a shipping company that only provided local transport of petroleum to gas stations from a terminal owned by another company. It was not responsible for transporting petroleum products from out of state. Here, however, Defendant Dean Transportation purchases product directly from out-of-state manufacturers, ships it into Tennessee, and then delivers products to its own customers.

11

### B.   Plaintiff Was An Exempt Executive or Administrative Employee.

Defendant is also entitled to summary judgment because Plaintiff was exempt from the overtime provisions of the FLSA as an "executive" or "administrative" employee (or both). 29 U.S.C. § 213(a)(1). Defendant is entitled to summary judgment because the uncontroverted facts show that his primary duties qualified as "exempt" work at all times relevant to this case.

### 1.   Plaintiff Was Properly Classified Under the Executive Exemption

An employee is as an exempt "executive" if he or she (1) is compensated on a salary basis at a rate of not less than $455 per week; (2) has management as his or her primary duty; (3) customarily and regularly directs the work of two or more other employees; and (4) makes suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees that are given particular weight.  29 C.F.R. § 541.100. While an employer asserting this exemption must establish each of these elements through "clear and affirmative "evidence," it "does not bear any heightened evidentiary burden" in doing so. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 502-03 (6th Cir. 2007). Here, clear, affirmative and uncontroverted evidence shows that Plaintiff was properly classified as an exempt executive.

### *Plaintiff Received a Weekly Salary in Excess of $455 and Customarily and Regularly Directed the Work of Several Employees*

Plaintiff was—at all times relevant to this lawsuit—compensated on a salaried basis with a bi-weekly compensation of $2,082.50 to $2,172.81. SOFs 44, 46, 48, 90, 91. Those amounts plainly exceed the regulatory requirement of a biweekly salary of at least $910. *See* 29 C.F.R. § 541.602(b). Plaintiff understood that he was not compensated on an hourly basis as an RSS, and that he received a set salary for each week he worked regardless of the hours he worked in that week. SOFs 47, 48. There is no genuine dispute that Plaintiff was compensated on a qualifying salary basis.

The record also demonstrates that Plaintiff "customarily and regularly" directed the work of at least two full-time employees.  In fact, he admits he was responsible for supervising at least 12

12

route drivers at any time. SOFs 50, 51. Plaintiff also directed the work of these employees by scheduling them, assigning routes to them and providing them with training on routes or compliance with company policy. SOFs 67, 75, 77-79, 84, 85, 96. He evaluated his employees' performance, coached them when their performance was not meeting expectations, and ensured the employees he managed performed their job duties. SOFs 52, 53, 56, 57-59, 85, 86, 99, 100. There simply is no question of material fact regarding the Plaintiffs' customary and regular direction of two or more full-time employees.

### *Plaintiff's Primary Duty was Management*

As a Route Sales Supervisor, management was the Plaintiff's "principal, main major, or most important" duty. 29 C.F.R. § 541.700(a) (2014). An employee's primary is *not* that which is most time consuming, it is that which is most important. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 504 (6th Cir. 2007). When assessing whether management is an employee's primary duty, the regulations contemplate four non-exhaustive factors: "(1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; (4) and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* at § 541.700(a). To prevail on an exemption claim, Defendant must "carry its burden only on the primary duty element as a whole, not on each individual factor relevant to that inquiry." *Id.* at 505, n. 6. Courts look to the "totality of the circumstances" of the employment and the "character of the employee's job as a whole" in determining whether the employee's primary duty was management. *Roberts v. Dolgencorp, Inc.*, 2010 WL 4806792, at *6 (M.D.Tenn. Nov. 18, 2010) (quoting 29 C.F.R. 541.700(a)). Assessment of the totality of the circumstances of Plaintiff's employment as a Route Sales Supervisor compels the finding that his most important duty was management.

Plaintiff's management duties were more important to Defendant than those associated with driving a commercial motor vehicle. The regulations define management as:

> [I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees . . . providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102. Here, Plaintiff concedes he performed a wide array of management duties. SOFs 52-63, 65-68, 72-89. For example, the record indicates Plaintiff's RSS management duties included handling employee complaints, coaching and disciplining the employees who reported to him, making recommendations regarding probation or termination for his employees, evaluating his employees' workloads and adjusting their routes, ensuring his employees' compliance with company policies, and providing training to his employees as needed. SOFs 52-63, 65-68, 72-89, 95-103.

These duties were more important to Defendant than those performed by Plaintiff when he was filling in for absent drivers. Courts attach considerable significance to the employer's assessment of "the importance of the [employee]'s managerial duties with the importance of her non-managerial duties, keeping in mind the end goal of achieving the overall success of the company." *Thomas*, 506 F.3d at 505. In *Thomas v. SuperSpeedway,* the plaintiff—a gas station convenience store manager—alleged management was not her primary duty because she spent the majority of her time performing non-exempt tasks in her store such as stocking shelves with merchandise, sweeping the floors, and cleaning bathrooms. *Id.* at 503. However, the plaintiff testified that she performed a number of managerial duties—supervising, interviewing, hiring, training, and disciplining employees; preparing work schedules; resolving employee complaints; monitoring employee performance; and making recommendations as to hiring and other personnel

14

issues that were accepted by her supervisor. *Id.* at 502. The Sixth Circuit compared the relative importance of these duties, noting if the plaintiff "failed to perform her nonmanagerial duties, her Speedway station would still function, albeit much less effectively" but if she "failed to perform her *managerial* duties, her Speedway station would not function at all because no one else would perform these essential tasks." *Id.* at 505 (emphasis supplied). The Court ultimately concluded that Thomas's managerial duties "were much more important to Speedway's success than her non-managerial duties" and that management was clearly her primary duty. *Id.*

Here, as in *Thomas,* the management duties Plaintiff performed were significantly more important to Defendant's success than his non-managerial duties of driving sales routes in his employees' absences. Defendant relied upon Plaintiff to ensure that the drivers he supervised were properly trained, performing their job duties in a safe and efficient manner, and being held accountable for their performance through coaching and evaluations. SOFs 52-59, 67, 96-102. Defendant also relied on Plaintiff to use his judgment and analyze and make recommendations regarding redistribution or reduction of routes in order to maximize efficiency and productivity. SOFs 77, 78, 83. If Plaintiff failed to perform his managerial duties, then Defendant's sales would most certainly be impacted as his employees and the work they performed on their routes would no longer be properly monitored for efficiency, safety, compliance with company policy, or accountability for achieving company goals and standards.

Plaintiff's argument that he does not qualify as exempt relies upon his contention that, sometime in 2012, he began to fill in for absent drivers on more than half of his work days.[22] SOFs. 72, 73 Although the amount of time spent on management versus non-management duties is a factor contemplated in the primary duty analysis, it is certainly not a dispositive or determinative

---

[22] In fact, Plaintiff's complaint that his work load increased significantly in or around 2012 is based upon his contention that, after driving a route for an absent employee, he would still have to perform his supervisory functions. See SOF 73.

factor. Importantly, the regulations do not require the employee to spend any specific portion of her time on exempt management work to meet the primary duty requirement. 29 C.F.R. § 541.700(b)[23] ("Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."); *See also McCall,* 2014 WL 2159007 at *4 (noting same). Indeed, the Sixth Circuit has recognized that the time factor can be "'somewhat misleading' where 'the employee's management and non-management functions are not clearly severable.'" *Thomas,* 506 F.3d at 505-506 (quoting *Donovan v. Burger King Corp.,* 672 F.2d 221, 226 (6th Cir. 1982)). For example, in the recent case *McCall v. First Tennessee Bank National Association,* the Plaintiff—an Operations Manager at a bank branch—contended her primary duty could not be considered management because she estimated she spent up to 95% of her time performing non-managerial bank teller work. 2014 WL 2159007, at *9. The Court rejected this contention, noting that even if "Plaintiff did spend the vast majority of her time doing non-exempt work, the Court finds the balance of the other factors weigh heavily in favor of finding Plaintiff's primary duty was management and thus this [time] factor is not determinative." *Id.*

In this case, regardless of the actual number of hours he spent driving per week when he was covering routes during drivers' absences, Plaintiff admits he was never relieved of his supervisory obligations or expectations—even when the volume of routes he drove to cover for other employees increased in 2012 and 2013. SOF 74. In fact, Plaintiff testified it was his concurrent performance of both the driving and his management duties that caused him to work so many hours. SOF 73. The number of hours he spent driving per week is not dispositive of his primary

---

[23] While the pre-2004 implementing regulations included a specific focus on the amount or percentage of time an employee spent performing management duties to determine whether it was their primary duty, not all federal courts interpreted the regulations to require an employee to spend at least 50% of their time performing exempt management duties. The United States Department of Labor revised the regulations in 2004 and removed the percentage of time factor while noting the line of federal cases that had already found an employee could have a primary duty of management even if she spent less than 50% of her time performing exempt work. See Final Rule, 69 Fed. Reg. at 22122, 22136–37, 22185–87 (2004) (noting that "[f]ederal courts have found many employees exempt who spent less than 50 percent of their time performing exempt work…an employee can have a primary duty of management while concurrently performing nonexempt duties.").

16

duty, and, as in *McCall,* the balance of the other relevant factors weigh heavily in favor of the conclusion that Plaintiff's primary duty was management.

Plaintiff also had relative freedom from supervision at all times relevant to this case. Plaintiff and his fellow Route Sales Supervisors reported directly to the Branch Manager, Allen Deason. SOF 49. Plaintiff's testimony regarding his management duties includes references to submitting paperwork such as employee performance evaluations to Allen Deason for approval, and making recommendations regarding his employees to Allen Deason (which Deason did not challenge). SOFs 53, 57-59. These examples certainly do not constitute "over-the-shoulder supervision" while he performed his management duties, and a lack of[24] that type of constant supervision supports a finding that Plaintiff operated relatively free from supervision. *See Thomas,* 506 F.3d at 507.

Further, Plaintiff admitted he performed multiple management duties on his own—*i.e* without direct supervision or observation—including "coaching rides," "safety rides," and the preparation of evaluations for his employees based on his observation of their performance. SOF 53, 56, 57, 85-88. Other courts have found the performance of these types of management duties without direct supervision or observation to be sufficient to support a finding that management was the primary duty under this factor. *See e.g. McCall,* 2014 WL 2159007, at *7 (regular absence of the branch manager from the bank, plaintiff's actions of conducting teller observations and interviews without supervision and having the responsibility to disseminate information from Operations Management meetings that branch managers did not attend were sufficient to find plaintiff operated relatively free from supervision). Here, Plaintiff performed his management duties with relatively

---

24 "[N]othing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive.'" *Petit v. Dale Adams Enterprises,* 2014 WL 1874217, at *9 (N.D.Ohio May 8, 2014); see also *Beauchamp v. Flex–N–Gate, LLC,* 357 F.Supp.2d 1010, 1017 (E.D.Mich. 2005); *Thomas,* 506 F.3d at 507.

little supervisory oversight from his managers; this factor weighs in favor of management being his primary duty.[25] SOFs 53, 56, 57, 85-88.

Exempt executive employees make "suggestions and recommendations as to the hiring, firing, advancement, promotion *or* any other change of status of other employees" that "are given particular weight." 29 C.F.R. § 541.100(a)(3) (emphasis supplied). Even if the Court were to find that Plaintiff did not have an opportunity to hire, fire or promote employees,[26] Defendant can still meet the fourth prong of the executive exemption if the record shows that Plaintiff was instrumental to other employment status changes for the employees he supervised, such as reassignments or changes in benefits or pay.

The Sixth Circuit has defined a change of status as a tangible employment action that constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Keeton v. Flying J, Inc.,* 429 F.3d 259, 263 (6th Cir. 2005). In determining whether the Plaintiff's recommendation or suggestions regarding changes in status of his employees were given particular weight, the Court considers factors such as: "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. The suggestions must pertain to an employee whom the manager regularly directs. *Id.*

---

25 Courts also look to the relative compensation difference between a supervisor and those he supervises to determine whether supervisory functions are valued more highly than non-supervisory functions.  See e.g. *McCall,* 2014 WL 2159007 at *8; *Roberts,* 2010 WL 4806792, at *10. The relationship between the Plaintiff's salary and the wages paid to other employees for route driving performed by the employees he supervised further supports that management was the Plaintiff's primary duty. For example, in 2013, Plaintiff was on track to earn $57,247.50, while Ronnie Welch, Donald Knowles, and Gary Burrum—Route Sales Drivers Plaintiff supervised—earned $50,143.85, $53,553.40, and $53,577.17, respectively.

26 Defendant does not concede that Plaintiff did not have the authority to hire or fire employees. Rather, due to the market difficulties in Nashville during the relevant time period of 2010-2013, Plaintiff may not have had the opportunity to participate in interviewing, hiring or firing due to the dearth of available and qualified route sales driver candidates. SOFs 69-71. Route Sales Supervisors regularly participate in interviewing and hiring of driver candidates, and their opinions and recommendations regarding the hiring of candidates are given particular weight. SOF 102.

18

Here, the record provides a clear example of how Plaintiff's recommendation or suggestions regarding a tangible change in status for one of the employees he supervised was given particular weight SOFs 57-59. When Plaintiff recommended to his manager, Allen Deason, that the probation of Plaintiff's direct report (Jeff Rayburn) be extended by six weeks, he admits Mr. Deason did not challenge his recommendation and instead approved the extension. SOF 58. This is despite the fact that members of Defendant's management had indicated to Plaintiff that they believed Mr. Rayburn should be terminated from his employment. *Id.* The decision was ultimately left up to Plaintiff, and when Plaintiff—after observing Mr. Rayburn's improved performance—recommended that his probation be lifted, his recommendation was followed by the other members of Defendant's management. SOF 59.

Defendant also relied upon Plaintiff to analyze the workload of his drivers and use his judgment and experience to make recommendations regarding the reduction of routes in a way that would maximize efficiency and productivity. SOFs 77-78, 83. Plaintiff admits no one in Defendant's management disagreed with his recommendation regarding the number of routes that could be reduced. SOF 83. This reduction of routes had a direct impact on the amount of pay the affected drivers received, as they are compensated on a commission basis. SOF 78. In this instance, because the Defendant relied upon Plaintiff and his fellow supervisors to make recommendations regarding route reductions that they ultimately agreed with and implemented, Plaintiff was instrumental in changes of status for his employees, which here constituted both reassignments and a change in the rate of pay they were receiving. *See* 29 C.F.R. § 541.100(a). Plaintiff's influence and the weight given to his recommendations regarding the change of status for the employees he supervised are sufficient to meet the fourth prong of the executive exemption.

Finally, Plaintiff's performance of non-managerial work, such as driving routes in his employees

19

absence, does not disqualify him from being an exempt executive.[27] Exempt professionals "remain responsible for the success or failure of business operations under their management while performing the nonexempt work" whereas "the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods." *Petit v. Dale Adams Enterprises,* 2014 WL 1874217, at *3 (N.D.Ohio May 8, 2014). Here, Plaintiff admits in his deposition that he still performed his supervisory tasks, even when he had to drive multiple routes in a week. SOF 72. Further, he testified he would address employee concerns and customer complaints or perform management duties when he was able to do so, and not for a defined period of time or at the direction of his supervisor. SOF 73.

Plaintiff performed the nonmanagerial (but still exempt under the MCA) work of driving sales routes to provide coverage for employee absences, and he did so to ensure the needs of the Defendant's customers were being met while continuing to perform his managerial duties. This contrasts positively with the scenario of a truly non-exempt employee who performs a very limited set of exempt management duties for a finite period of time at the direction of a supervisor. Plaintiff's supervisory and management duties were his alone to accomplish at his convenience, and he was expected to continue to perform them even if he had to drive routes at times as well. SOFs 72-74. Plaintiff meets every element of the executive exemption, and his performance of non-managerial, exempt route sales driving does not detract from or diminish his exemption status.

## 2. Plaintiff was Properly Classified as Exempt Under the Administrative Exemption

In addition to, or in combination with, the executive exemption, Plaintiff was also properly classified as an administratively exempt employee. An employee is an exempt administrative employee if (1) he or she is paid at least $455 per week on a salary basis; (2) his or her "primary duty

---

27 Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. See 29 C.F.R. § 541.106. "Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700." *Petit v. Dale Adams Enterprises,* 2014 WL 1874217, at *3 (N.D.Ohio May 8, 2014).

20

is the performance of office or non-manual work directly related to the management or general business operations of the employer," and (3) the "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(1)-(3). The Sixth Circuit has recently observed that "this circuit and other circuits have resolved many administrative-exemption cases as a matter of law." *Henry v. Quicken Loans, Inc.,* 698 F.3d 897, 901 (6th Cir. 2012). Here, resolution by summary judgment in favor of Defendant on the administrative exemption is warranted.

As more fully discussed above, and for the same reasons, Plaintiff meets the first and second prongs of the executive exemption test, Plaintiff meets the first and second prong of the administrative exemption test. Plaintiff was indisputably compensated in excess of $455 a week. And, as with the executive exemption, consideration of the employee's "primary duty" is critical to an analysis of the propriety of the application of the exemption. The definition of "primary duty" is the same under both the executive and administrative exemptions—*i.e.* the employee's "principal or 'chief'" duty or "the most important-duty performed by the employee." *Thomas*, 506 F.3d at 504; *see also* 29 C.F.R. § 541.700(a). To qualify for the administrative exemption, an employee's "primary duty" must involve "work directly related to the *management* or general business operations" of the company or its customers. 29 C.F.R. § 541.200(a)(2) (emphasis supplied). The factual record in this matter clearly supports a finding that Plaintiff's primary duty was management, and consequently, the Plaintiff's primary duty also meets the second prong of the administrative exemption.

Plaintiff also meets the third requirement of the administrative exemption because his primary duty of management required the regular and consistent exercise of discretion and independent judgment with respect to matters of significance. According to the regulations, "discretion and independent judgment" means the "comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29

21

C.F.R. § 541.202(a). Under the regulations, "the decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.* at § 541.2(c). In analyzing whether an employee exercised discretion and independent judgment, some of the factors to consider include:

> [W] whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business. . . whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long-or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). When applied to the facts of this case, these factors and the overall definition of "discretion and independent judgment" clearly demonstrate that Plaintiff was a *bona fide* administrative employee.

Consistent with his primary duty of management, Plaintiff performed myriad duties that required his exercise of discretion and independent judgment with matters of significance to Defendant. The term "matters of significance" refers to the level of importance or consequence of the work performed. Some of the duties that required Plaintiff's exercise of discretion and independent judgment involved direct action on Plaintiff's part, and some involved his recommendation for action.

By way of example, Plaintiff regularly analyzed and made recommendations regarding the reduction or redesign of routes to maximize efficiency and productivity for his employees, changes which affected business operations in his division to a substantial degree. SOFs 77, 78, 83. And Defendant credited Plaintiff's judgment on these matters. During one route-reduction exercise, for example, Plaintiff was asked to reduce the number of routes driven by drivers by seven. SOF 83. Plaintiff testified, however, that he concluded that a reduction of four routes was appropriate, and that the company agreed with this recommendation. *Id.* More broadly, however, Plaintiff testified

that, in addition to discrete route-reduction exercises "[a]s a supervisor, it was part of my job to always evaluate how a route was run, to help tweak it, move stops around inside that route to help each individual route man improve and get better in being able to take care of a customer." SOF 79.

Additionally, the management duties Plaintiff performed as a part of his supervision of his employees are further examples of how he exercised discretion and independent judgment with respect to his primary duty. Plaintiff constantly and consistently exercised his own discretion and judgment when evaluating his employees' performance through his observation of them during coaching rides, in their formal performance evaluations, or when recommending extensions to or the cessation of probation for his employees. SOFs 52, 53, 56, 57-59, 86, 88. The performance of such management tasks are examples of an employee's regular exercise of discretion and independent judgment. *See Kollstedt v. Princeton City Schools Bd. of Education,* 2011 WL 249496, at *11 (S.D.Ohio Jan. 26, 2011). (Plaintiff clearly exercised discretion and independent judgment on a regular basis including in "the evaluations and the disciplining-or lack thereof-she conducted of her employees").

Indeed, Plaintiff even describes the RSS position as requiring a certain "thought process," which he describes as including the ability to think ahead, and look at what needed to be done while analyzing ways to fix problems. SOF 106. The Plaintiff's own testimony regarding the frequency with which he used his judgment in his RSS position, the management expectations for the position which included regular and consistent evaluation of his employees based on his judgment, and the discretion he exercised when performing analysis or projects requested by Defendant's management present a totality of circumstances which firmly support a finding that Plaintiff exercised sufficient discretion and independent judgment to meet the third prong of the administrative exemption test.

The expectations for Plaintiff in his position, and the duties he admits he performed as an RSS were those of a *bona fide* administrative employee, and he was properly classified under that exemption.[28]

## IV.    Conclusion

Plaintiff was an exempt executive and/or administrative employee throughout the period at issue in this case.  But even if his primary duty shifted to driving sometime in 2012, as Plaintiff suggests, he remained exempt under the Motor Carrier Exemption to the FLSA.  The Court should grant Defendant's motion for summary judgment.

---

[28] While Defendant contends that Plaintiff qualifies for both the executive and administrative exemption, he is, alternatively, exempt under the "combination exemption" of 29 C.F.R. § 541.708 because his primary duties "involve[d] a combination of exempt administrative and exempt executive work."

## CERTIFICATE OF SERVICE

I hereby certify that on this the 3rd day of July, 2014, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Anne C. Martin
Bone McAllester Norton PLLC
511 Union Street, Suite 1600
Nashville, TN 37219

Jonathan Williams
Larry R. Williams, PLLC
329 Union Street
P.O Box 190632
Nashville, TN 37219

*/s/ Chris R. Pace*

**ATTORNEY FOR DEFENDANT**

18350905.1

25