# EXHIBIT 1

## Ex Parte No. MC–48

## DETERMINATION OF JURISDICTION OVER TRANSPORTATION OF PETROLEUM AND PETROLEUM PRODUCTS BY MOTOR CARRIERS WITHIN A SINGLE STATE

*Decided March 7, 1957*

1. Upon investigation, characteristics which generally are determinative of Commission's jurisdiction over motor transportation within a single State, of petroleum and petroleum products, in tank vehicles, which have a prior movement by rail, pipeline, motor, or water from an origin in a different State, enumerated.
2. Under the general industry pattern of shipment, storage, and distribution, motor transportation under consideration herein found to be intrastate, requiring no modification of the treatment generally accorded individual application proceedings by the Commission.
3. *Petroleum Carrier Corp. Common Carrier Application*, 48 M. C. C. 719, to the extent inconsistent with the discussion herein, overruled.

*Eric E. Ebert, Wilmer A. Hill, Harry C. Ames, Jr., Robert H. Shertz, Tom Steele, Randall Swanberg, C. Austin Sutherland, James E. Barrett, John R. Mahoney, Gerald L. Phelps, John R. Sims, Jr., L. A. Odom, Harold G. Hernly, Harold Ainsworth, Frank B. Hand, Jr., Dale C. Dillon, Einar Viren, R. E. Powell, Bert Collins, Robert S. Stauffer, John Draper, Donovan N. Hoover, G. Donald Bullock, Robert A. Sullivan, George S. Mullins, Jack Goodman, John H. Eisenhart, Jr., Marion F. Jones, Herbert L. Smith, William B. Adams, Edgar Watkins, Louis E. Smith, W. Palmer Van Arsdale, Rex H. Fowler, George R. Watson, Frank A. Graham, Jr., Glenn W. Stephens, Arthur P. Boyton, Robert J. Bernard, F. X. Masterson, Donald A. Brinkworth, John W. Adams, Jr., James G. Lane, Thormund A. Miller, James L. Tapley, James W. Wrape, Mack Stephenson, R. J. Reynolds, Jr.,* and *Martin Sack* for various carriers and carrier associations.

*Jefferson C. Church, Edward Munce, I. E. Chenoweth, Austin L. Roberts, Jr., Everett Kreeger, Guyte P. McCord, Jr., William M. Berry, W. M. Buttram, John Hill Payler, C. H. Noah, Herman L. Bode, Reuben G. Crimm, James E. Singleton, V. M. Parshall, L. D. Abney, Edward M. Meredith, William E. Torkelson, Walter R. McDonald, David O. Benson, William C. Seibert, Joseph J. Brown, Otto A. Radke, Louis W. Petteway, Douglas M. Morrill, Thomas A. Graham, R. W. Wheeler, Frank J. Iuen, George M. Catlett, John L. Roach, L. C. Cypert, William B. Elmer, Frank P. Hayes, John M. Agrey, Harold T. Upgren,* and *Louis J. Caruse* for various State commissions and associations thereof.

71 M. C. C.

LLMC DIGITAL

*A. G. Anderson, William B. Meacham, Herman J. Shroeder, Charles H. Jones, Jack Vickrey, Jack E. Hale, L. W. Witte, J. W. Hunter, Robert Maguire, Thomas G. Rabbitt, William H. Morley, W. D. Ohle, F. M. Holloway, L. S. Davidson, Raymond R. Hooper, M. W. Key,* and *Paul J. Bond* for various shippers, pipelines, and other interested parties.

## REPORT OF THE COMMISSION

BY THE COMMISSION:

This is an investigation instituted by order of February 7, 1955, for the purpose of determining the extent of our jurisdiction over motor-carrier transportation, within a single State, of petroleum and petroleum products, in tank vehicles, which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State.

No exceptions were filed to the examiner's proposed report which concluded that the transportation under investigation herein should be found to be intrastate commerce. We agree with the conclusions reached therein, and adopt as our own without significant change the text of that report, except the discussion relating to proportional rates and transit provisions which issues now are moot.

Underlying the institution of the investigation were, (1) three petitions, filed by Refiners Transport and Terminal Corporation, Hugh Breeding, Inc., and Commercial Transport, Inc.,[1] all motor common carriers, urging the necessity for a clear-cut determination of the question, and (2) the continuous receipt at a persistently high rate of many applications by motor carriers seeking interstate operating authority to perform transportation of the type described above. In addition to the interest of the parties in the foregoing categories, the order of investigation stimulated a widespread expression of interest by numerous State regulatory authorities. In an effort to obtain a complete factual record, we invited, in addition to those having manifested an interest in the proceeding, a great many shippers of petroleum and petroleum products, carriers by pipeline, and others to supply qualified witnesses to testify with respect to the matters involved. Subsequent to the hearing briefs were filed by a great many of the parties.[2]

---

[1] Hugh Breeding, Inc., and Commercial Transport, Inc., prior to the hearing herein, filed notification of their intention to terminate their participation in the investigation.

[2] Public Service Commission of the State of North Dakota, E. B. Law and Son, Inc., and Trans-Mex Tankers, Inc., National Association of Railroad and Utilities Commissioners joined by the State commissions regulating motor carriers of Alabama, Arkansas, Florida, Georgia, Iowa, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Carolina, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Virginia, Washington, and Wyoming; Florida Railroad and Public Utilities Commission; Rice Truck Lines, State Corporation Commission of New Mexico; Southeastern Association of Railroad and Utilities Commissioners embracing the States of Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia; and the Michigan Public Service Commission.

71 M. C. C.

LLMC DIGITAL

The Kentucky Department of Motor Transportation filed a protective motion to dismiss and set aside the proceeding on the ground that we are without jurisdiction of the subject matter and that the notice under which the proceeding was instituted is so broad as not to conform to the requirements of procedural due process of law. We obviously have the power in a duly instituted proceeding, such as this, to take testimony bearing on transportation questions formally presented before us. The motion is hereby overruled.

### EVIDENCE

Evidence bearing on the methods of shipment, storage, and distribution as practiced by the petroleum industry and the historical regulatory pattern to which the transportation has been subjected was adduced by witnesses representing 16 shippers [3] using interstate pipeline and water facilities in the distribution of their products; the American Petroleum Institute; the Plantation Pipeline Co.; rail carriers of the Southern Freight Association; and 9 State regulatory commissions.[4]

The evidence submitted covers a broad cross section of the shipping practices of the petroleum industry. In nearly all respects material to the issues herein, the distribution methods of the various companies are similar. Generally such products are scheduled for shipment via pipeline or water on a monthly or other periodic basis so as to maintain at the destination terminal storage a supply which is adequate to meet estimated area requirements. These estimates are predicated on the historical area pattern, with consideration being given to loss or addition of customers, contemplated percentage of increase or decrease in demand, seasonal variations, inventory buildup or depletion, and other anticipated influences such as advertising and sales promotion campaigns. The time in storage of any given quantity varies substantially between terminals and is dependent upon many different factors such as the type of product, the type of period or season, and the method of supply.

In the Northern States fuel-oil sales during the summer months are relatively negligible. This being the filling-up period, the terminal storage tanks have a turnover rate not exceeding once in 3 or 4 months.

---

[3] Socony Mobil Oil Co., Inc., Atlantic Refining Co., Sinclair Refining Co., The Texas Co., D–X Sunray Oil Co., Ashland Oil and Refining Co., Shell Oil Co., Magnolia Petroleum Co., Arkansas Fuel Oil Corp., Cities Service Oil Co. (Pennsylvania), Sun Oil Co., Cities Service Oil Company of Delaware, Pure Oil Co., Western Oil and Fuel Co., Skelly Oil Co., and Standard Oil of California.

[4] Georgia, Indiana, Kentucky, Michigan, Minnesota, New Mexico, Pennsylvania, South Dakota, and Wisconsin.

71 M. C. C.

LLMC DIGITAL

Gasolines, however, except in summer-resort areas, generally have a more even throughput.

Barge or tanker supplied terminals generally have sufficient storage available to permit the receipt of the entire contents of the vessel. At such terminals volume of throughput takes a secondary position. Marine supplied points are further affected, when on fresh water, by the periods of the year when the waterways are frozen. In such cases an effort is made to put into terminal storage sufficient product to accommodate demands through the closed season of navigation. Pipeline terminal turnover, on the other hand, is governed largely by the number of pumping cycles possible during any given month, and may vary from twice a month for active products to as little as one turnover in 2 months for slower moving grades.

In shipping by pipeline individual companies make tenders varying from 10,000 barrels to 50,000 barrels at one time. Many pipeline companies require a minimum tender of 25,000 barrels of 42 gallons each, or a total of 1,050,000 gallons. No particular quantities are shipped against specific orders, and no designated ultimate destinations are known when the products leave the initial points of origin prior to the pipeline or water movement. Some companies do, however, maintain certain contracts with dealers, consumers, distributors, and so-called fleet accounts which are written mainly on an annual renewable basis and may be canceled on not less than 30 nor more than 90 days' notice. These contracts, however, are not "requirement" contracts, but merely specify minimum and maximum quantities. Actual volumes which may be purchased in any given period are not directly related to the contract minima or maxima and rarely are any specified quantities adhered to. Pipeline and marine deliveries come to definite rest at all terminal storage points for indefinite periods before being independently reshipped. There appears to be neither any necessity, purpose, nor intent to ship products through terminal storage to interior points or ultimate consumers under any through arrangement or method involving a continuity of transportation.

The average overall turnover from terminal storage for one of the large shippers along the Atlantic seaboard is approximately 5.5 times per year and for the midwestern area approximately 5.8 times per year. For the year ended May 1, 1955, a breakdown as to individual product turnover for this shipper in the midwestern area shows a turnover rate for gasoline of 7 times per year, for burning oils—3 times, for distillates—5.7, and for residuals—9.2. The consistent purpose of the shippers entails nothing more than the maintenance of a fixed amount of product at the pipeline and marine terminal storage from which they may locally market, sell, allocate, and ship as the demand therefor

LLMC DIGITAL

is manifested. The terminal tank farms are intended as, and actually are used as a large bulk storage facility and, except in the case of one pipeline, the storage tanks are owned by the petroleum shippers. The products of various petroleum companies of the same type and grade are commingled with a complete loss of identity while in transit and in storage. Frequently the products are further processed by the addition of certain additives at the time of removal from storage or during the process of shipment beyond.

At the time of the initial tender for interstate pipeline or water movements the shippers do not know the ultimate destination of any given quantity of their products, and no through bill of lading is issued beyond the terminal storage point. In fact, except in the case of one pipeline which will be subsequently discussed, there is no perceptible effort on the part of the original shipper to establish a persisting intent or to perfect a through movement by means of any type of through-rate arrangement. As sales are made and orders are taken against the products that rest in the terminal storage facilities, new and independent bills of lading and shipping orders are drawn, and the products are shipped in terms of gallons ranging from tank-truck loads of about 5,000 gallons up to tank-car loads of about 10,000 gallons.

In all instances, except one, the shippers offering evidence in the proceeding urge that the shipments involved come to a definite and specific rest at the pipeline or marine terminal storage; that the subsequent distribution therefrom is a separately conceived and newly executed arrangement for transportation; and that such subsequent transportation when limited to a movement within a single State has always been considered to be intrastate in nature. The one company not sharing these firm convictions did not express a strong opinion either way, but merely indicated its desire that the question be clearly settled and the controversy put at rest. This company ships through the facilities of the one pipeline which owns the terminal storage tanks. Its representative apparently attaches some significance to the fact that the products do not come into its physical possession at the pipeline terminal and that from the beginning there exists a basic intention that such products ultimately be sold and moved beyond the storage point. There is no manifestation or direct evidence, however, of the existence of any specifically formulated intent to ship through the storage point. In fact this company ships and markets in the same general manner as do the others. It ships in tenders of 10,000 to 50,000 barrels each and participates in exchange agreements with other petroleum companies. Its agents or customers place orders on the terminal storage supply, and if a sufficient supply is not available

71 M. C. C.

LLMC DIGITAL

at one terminal orders will be shifted to another. As orders are re-
ceived, a truck-loading order, which is drawn in such a fashion as to
constitute a bill of lading, is executed and issued independently of any
previous conception of product distribution. This is presented at the
storage point as authority to release the indicated quantity. The time
of issuance of such truck-loading order and bill of lading is the first
time that any definite type or quantity of product is designated to a
definite consignee at a definite destination. Thus, there is no signifi-
cant difference between the shipping practices of this shipper and
those of the others which have been discussed, nor can it be concluded
that the type of commerce is not the same.

In an effort to draw a simple analogy to demonstrate the workings of
all pipeline tenders and the practice of commingling the products
of various companies, certain of the parties liken the transactions to
the deposit of money in a bank wherein the depositor receives only a
credit to withdraw not necessarily the same product tendered, but a
similar quantity of the same grade and type. The privilege of trans-
ferring such credit is also inherent in most transactions.

The historical regulatory pattern which has grown up around the
type of transportation here involved has rather consistently labeled
such transportation as intrastate commerce. The regulatory com-
missions of the several States have assumed jurisdiction of the carriers
providing such transportation and have undertaken the exclusive regu-
lation thereof in the same manner as other intrastate commerce within
their respective boundaries. The motor transportation industry which
is servicing this type of traffic has grown and developed over the years,
based upon a pattern of authorized intrastate carriers. This Com-
mission has likewise recognized such transportation to be intrastate
and has not undertaken to assume jurisdiction thereof, nor to interfere
with its regulation by the several States.

At the time of the hearing the one exception to the foregoing intra-
state pattern which was established of record involved traffic moving
through the pipeline of the Southeastern Pipe Line Company under
a proportional rate tariff [5] which had been in effect for some years.
This tariff contained a transit provision covering petroleum products
tendered at Port St. Joe, Fla., for movement by pipeline which, after
such movement, were held in terminal storage tanks, provided by the
shipper, for the purpose of storing, blending, or mixing for periods not
exceeding 1 year. If reshipped within that period beyond the terminal
to destinations covered by the tariff, the original shipper was entitled
to the application of the proportional rate provided therein. The

---

[5] The proportional rate and transit arrangements were canceled on June 11, 1956, by
Southeastern Pipe Line Company tariff I. C. C. No. 19.

e 3:13-cv-00862    Document 26-1    Filed 07/03/14    Page 7 of 17 PageID #:

LLMC DIGITAL

rate was applicable only when the subsequent transportation from the pipeline station was made by a duly certificated interstate motor common carrier or railroad at interstate rates from the station to the ultimate destination. Application of the proportional rate was given effect through a refund of charges to the original consignor at Port St. Joe, Fla. Pipeline rates were stated in cents per barrel of 42 gallons, and a minimum tender of 25,000 barrels was required at Port St. Joe from 1 consignor to 1 consignee. A new bill of lading was issued by the shipper from the terminal storage point, and the facts of record establish that there was no relationship between the subsequent motor-carrier movement and the prior pipeline movement either by tariff concurrence, through-rate arrangement, or otherwise. Motor-carrier movements to the extent made from terminal storage have been in tank-truck quantities of 4 to 5 thousand gallons at rates published in cents per 100 pounds. Except for the privilege of applying retroactively the substantially lower proportional rates solely to the pipeline portion of the movement, the shipments were tendered, shipped, commingled, and stored at the pipeline terminal for subsequent marketing and shipment in the same fashion as in the case of the usual movements through other pipeline facilities.

Though within the scope of the investigation, the record contains no evidence concerning any significant interstate movements by rail or motor prior to storage for subsequent motor transportation to points within a single State. The subsequent discussion, therefore, involving movements from pipeline or water terminals does not necessarily have any factual relationship to situations involving prior moto. or rail movements, if such distribution methods are actually practiced on any substantial scale.

### POSITIONS OF THE PARTIES

As pressed on brief, the positions of the parties fall generally into three categories. First, the large majority [6] who urge that the facts clearly establish that the operations physically within one State historically have been and continue to be intrastate commerce; second, a motor common carrier [7] which urges that we should exercise great caution in viewing the evidence before concluding that the transportation here involved, without exception, is intrastate commerce; and third, those [8] who urge that the definition of "interstate com-

---

[6] The National Association of Railroad and Utilities Commissioners and the individual States concurring in that brief, The Southeastern Association of Railroad and Utilities Commissioners, The Florida Railroad and Public Utilities Commission, The Michigan Public Service Commission, The State Corporation Commission of New Mexico, and The Public Service Commission of North Dakota.

[7] Rice Truck Lines.

[8] E. B. Law and Son, Inc., Trans-Mex Tankers, Inc., and in part by the State Corporation Commission of New Mexico, but the latter does not rely thereon in its prayer for relief.

71 M. C. C.

LLMC DIGITAL

merce" under part II of the Interstate Commerce Act does not vest jurisdiction in this Commission to regulate such transportation where the prior movement is by pipeline.

Those filing briefs in support of the first proposition urge that the following summary of facts is clearly supported by the record and is of controlling importance in the proceeding: (1) that the only transportation intent of the original shipper is to forward an adequate supply of petroleum products to terminal storage points; (2) that no through bill of lading is issued by the shipper covering the overall transportation movement; (3) that no sales of the products are identified at pipeline or barge origins; (4) that shipments are commingled in transit and in terminal storage tanks; (5) that there is further processing of some products while in storage or at the time of leaving storage; (6) that no shipment can be identified as to destination or quantity until it leaves the terminal storage point; (7) that transportation by motor carrier outbound from terminal storage points is distinct and apart from any inbound movement; (8) that transportation from storage points to ultimate consumer is a new concept of transportation evidenced by a bill of lading showing the terminal storage point as the origin of the shipment; (9) that with a single exception, the commodity is not shipped under joint or proportional rates; and (10) that the several States are actively engaged in the regulation of the subject transportation as intrastate commerce.

It is urged that these facts considered in the light of the legal maxim of "rule of intention," followed by this Commission and the courts, clearly establish the commerce involved as intrastate, citing primarily *Eldon Miller, Inc., Extension—Illinois*, 63 M. C. C. 313, and *Atlantic Coast Line R. Co.* v. *Standard Oil Co.*, 275 U. S. 257.

A number of these parties also urge that the conclusions reached by the Commission in *Petroleum Carrier Corp. Common Carrier Application*, 48 M. C. C. 719, are erroneous, primarily because of the assumed validity of the so-called proportional or transit tariff of Southeastern Pipe Line Co., and of the conclusion on that basis that intrastate transportation was converted to interstate. They raise no question with respect to the function or effect of what they term "true proportional rates of true transit provisions." It is contended that the petroleum products coming to rest at the Southeastern Pipe Line terminals are shipped, handled, stored, and marketed in the same fashion as other shipments of petroleum products and that the mere existence of the so-called proportional rates or transit privileges does not warrant any different conclusion. They urge that the *Petroleum Carrier* case should be reopened for the purpose

71 M. C. C.

LLMC DIGITAL

of correcting the erroneous determination made therein and that a simultaneous investigation should be instituted into the provisions of the Local and Proportional Tariff No. 11, I. C. C. No. 17 of the Southeastern Pipe Line Company so as to afford such carrier an opportunity to show cause why the so-called proportional rates and transit provisions should not be stricken therefrom.

The carrier supporting the second proposition set forth above stresses that the courts are in the process of broadening their concept of interstate commerce as it relates to pipeline operation. It cites *Standard Oil Co.* v. *Federal Trade Commission*, 340 U. S. 231, (1951) wherein the Supreme Court recognized as interstate transportation a movement which involved storage en route built up on the basis of "area estimate and demand" even though the specific ultimate destinations were unknown. This case involved a prior water movement through a marine storage terminal in Michigan for subsequent distribution within that State. *Stafford* v. *Wallace*, 258 U. S. 495, is also cited as the case in which the "germ" of the foregoing concept was born. It urges that other Federal courts have also applied the "area estimate and demand" rule and have concluded that commerce shipped in this fashion is not divested of its interstate character. It considers of primary importance the question of whether a shipper is tendering the product to the pipeline for the purpose of shipping "through" rather than "to" the terminal with the intention of supplying the need of a particular area. The concession is made that if the shipper is shipping "to" storage at the terminal with the intention of keeping all of the available storage filled regardless of the possibility of sale of the product in the area, such circumstances would indicate a genuine interruption in the interstate movement. It urges that in any conclusion reached herein we should assert jurisdiction or reserve the right to do so in those cases involving the "area estimate and demand" rule when coupled with the shipper intent to ship "through" the terminal storage.

Those parties supporting the third proposition urge that our powers over interstate commerce do not extend beyond those expressly delegated by the Congress in the Interstate Commerce Act. They contend that under part II of the act, section 203 (a) (10) limits our jurisdiction to interstate transportation moving "wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water." The definition of "foreign commerce" contains the same language as quoted above. Based on these expressions, it is urged that Congress failed to include commerce moving "partly by pipeline" in the definition which confers and limits our powers, and they submit that we should conclude that no jurisdiction exists over the transportation involved herein and that such decision should turn upon the question of absence of delegated powers.

71 M. C. C.

LLMC DIGITAL

### DISCUSSION AND CONCLUSIONS

It should be stated at the outset that despite the many criteria and various approaches which have been used by the courts in construing the Commerce Clause of the Federal Constitution—and though some suggest that the courts are in the process of broadening the scope of their concept of interstate commerce—the question before us here does not involve the constitutionality of the Interstate Commerce Act nor any other statute in which the power of Congress to regulate the various aspects of commerce either *constitutes* or is woven into the primary issue to be resolved.

*The general character of the commerce.*—The phase of transportation within the physical confines of a single State which is here in issue has for a long period of years received a notably uniform treatment by the courts, this Commission, and the regulatory authorities of the several States. Going back to one of the landmark cases, prior to the advent of motor-carrier regulation, in which the question of marine and pipeline terminal storage distribution was in issue, the Supreme Court, in 1927, in *Atlantic Coast Line R. Co.* v. *Standard Oil Co.*, 275 U. S. 257, stated:

> The question whether commerce is interstate or intrastate must be determined by *the essential character of the commerce,* and not by mere billing or forms of contract, although that may be one of a group of circumstances tending to show such character. The reshipment of an interstate or foreign shipment does not necessarily establish a continuity of movement or prevent the shipment to a point within the same State from having an independent or intrastate character * * *.
>
> The important controlling fact in the present controversy, and what characterizes the nature of the commerce involved, is that plaintiff's [Standard Oil Co.] whole plan is to arrange deliveries of all of its oil purchases on the seaboard of Florida so *that they may all be there stored for convenient distribution in the State to the 123 bulk stations and to fuel oil plants in varying quantities according to the demand of the plaintiff's customers,* and thence be distributed to subordinate centers and delivery stations, and this plan is being carried out daily. There is neither necessity nor purpose to send the oil through these seaboard storage stations to interior points by immediate continuity of transportation. The *seaboard storage stations are the natural places for a change from interstate and foreign transportation to that which is intrastate,* and there is nothing in the history of the whole transaction which makes them otherwise, either in intent or in fact. *There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages* of the plaintiff company at Tampa, Port Tampa, Jacksonville or the St. Johns River terminal. Everything that is done after the oil is deposited in the storage tanks at the Tampa destinations, or at the Jacksonville destinations, is done in the distribution of the oil to serve the purposes of the plaintiff company that imported it.
>
> *        *        *        *        *        *        *
>
> *We have no hesitation in saying that the nature of the commerce in controversy in this case was intrastate.*    [Italics added.]

71 M. C. C.

LLMC DIGITAL

After the passage of the Motor Carrier Act of 1935, when this Commission had occasion to determine whether jurisdiction had thereby been established to regulate this type of transportation, the Court's reasoning in the *Atlantic Coast Line* case was followed.   One of the early cases, *Bausch Contract Carrier Application*, 2 M. C. C. 4, involved the transportation of petroleum products from a pipeline terminal at Superior, Nebr., to Nebraska points.   These products had moved into the shipper's storage tanks by pipeline from Enid, Okla.   The Commission concluded:

at the time the products are shipped from Enid, it may not be determined where they will go after being placed in the storage tanks at Superior.  The only destination then known to the shipper is the latter point.  It must be concluded, therefore, that products so transported are no longer in interstate commerce after delivery into the storage tanks at Superior, but have come to the end of their interstate journey, and any movement therefrom must be considered as another shipment separate and distinct from and not a continuation of the movement thereto.

Over the years this same reasoning has been followed when issues involving this question have arisen.   Compare *Moses Contract Carrier Application*, 4 M. C. C. 425, and *C. E. Hall and Sons, Inc., Contract Carrier Application*, 24 M. C. C. 33.   The same reasoning, likewise has been followed as to general commodities moved interstate into a warehouse for distribution, *Surles Contract Carrier Application*, 4 M. C. C. 488; the same also as to lumber receiving terminal storage prior to distribution, *Bassetti and Lawson Extension of Operations—Lumber*, 33 M. C. C. 739; and the same as to other commodities, *Baker Common Carrier Application*, 7 M. C. C. 255, *Davidson Contract Carrier Application*, 9 M. C. C. 682, and *Moulton Extension of Operations—Boston–Barre, Mass.*, 13 M. C. C. 79.   Also in *Petroleum Carrier Corp. Common Carrier Application*, 48 M. C. C. 719, though primarily involving a controversy over proportional rates and transit, which will be subsequently discussed herein, it nevertheless included a situation similar to the usual transportation practices of the remainder of the industry, and we recognized the distribution beyond terminal storage to be intrastate as follows:

Petroleum products transported through Plantation are generally stored adjacent to the various pipeline outlets and ultimate distribution is made from storage, usually to points in the same State, in intrastate commerce.

Recently in *Eldon Miller, Inc., Extension—Illinois*, 63 M. C. C. 313, and *Wheeling Pipe Line, Inc., Extension—Arkansas*, 63 M. C. C. 353, division 5 had occasion to review its past position on the issues here involved, and it reaffirmed what had come to be almost axiomatic over the years—that such transportation is intrastate.   Even more recently, since the hearing herein, decisions have been issued in most, if not all,

71 M. C. C.

LLMC DIGITAL

of the many applications involving this question which were received just prior to the institution of this proceeding. The reasoning of the *Miller* case was followed in disposing of such applications, and the operations were found to involve movements in intrastate commerce. In each proceeding, however, it was observed that the pendency of the instant investigation might produce grounds for a different conclusion, and the results therein were indicated to be without prejudice to any different conclusion which might be warranted on the basis of a more comprehensive record in this proceeding. The facts of record herein and the law which is applicable thereto obviously do not warrant any different conclusion. To the contrary, they strongly support the correctness of this Commission's past decisions and further indicate that no material change has evolved in the shipping and distribution pattern long followed by the petroleum industry.

Those who argue the contrary clearly must do so against the overwhelming weight of the authorities where issues under the Interstate Commerce Act have been involved. In relying on *Stafford* v. *Wallace*, *supra*, and *Standard Oil Co.* v. *Federal Trade Commission*, *supra*, they would substitute criteria employed by the courts in a consideration of the constitutionality or remedial purposes of other statutes not here involved. In fact, the Supreme Court, in the *Atlantic Coast Line* case, *supra*, distinguished its conclusion therein from that reached in the *Stafford* case, with the following language:

In that case [Stafford] the question under consideration was the validity of the Packers and Stockyards Act of Congress of 1921 c. 64, 42 Stat. 159, providing for the supervision by Federal authority of the business of the commission men and of the live stock dealers in the great stock yards of the country, and it was held that for the purpose of protecting interstate commerce from the power of the packers to fix arbitrary prices for live stock and meat through their monopoly of its purchase, preparation in meat, and sales, *Congress had power to regulate the business done in the stockyards, although there was a good deal of it which was, strictly speaking, only intrastate commerce.*

   \*       \*       \*       \*       \*       \*       \*

*the case cannot be cited to show what is interstate and what is intrastate commerce in a controversy over rates to determine whether they come normally within the regulation of Federal or State authority.* [Italics added.]

Similarly, the *Standard Oil Co.* v. *Federal Trade Commission* case involved a situation where the remedial purposes of another regulatory statute were in jeopardy. As stated by the Court:

In order for the sales here involved to come under the Clayton Act, as amended by the Robinson-Patman Act they must have been made in interstate commerce \* \* \* Such sales are well within the jurisdictional requirements of the Act. Any other conclusion would fall short of the recognized purpose of the Robinson-Patman Act to reach the operations of large interstate businesses in competition with small local concerns.

71 M. C. C.

LLMC DIGITAL

There is no similar press of circumstances here.  As already noted, the States have not ignored or neglected the transportation here involved, but have absorbed it into their regulatory scheme without apparent ill effect on the commerce which is subject to the jurisdiction of this Commission.

*The criteria.*—The many decisions on the question with their various shades of distinctive facts, together with the extensive factual picture presented herein, produce what some have called a large "bundle of circumstances" which *in toto* clearly indicates the intrastate nature of the transportation.  Obviously, however, it is not necessary that the entire "bundle" be present in a given case before a proper determination can be made.  It might be well, therefore, for the sake of emphasis and clarity to identify those primary criteria which ordinarily control determination of the character of the commerce in the type of operation here under consideration.

In determining "the essential character of the commerce" the factor most often relied on is the fixed and persisting transportation intent of the shipper at the time of shipment.  As applied to the type of traffic here involved, the major manifestations of this intent, or the absence thereof, may be found in the following: (1) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, (2) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (3) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.  These things, it is believed, are basically sufficient to establish that the continuity of transportation has been broken, that the initial shipments have come to rest, and that the interstate journey has ceased.

The many other subordinate factual circumstances which were heretofore enumerated, such as commingling in transit and in storage, processing before reshipment, the form of the bill of lading, the specific rate of product turnover at the terminals, et cetera, are additional manifestations which may be important in certain types of cases, but which also may or may not be present or identical in others.

*The Commission's delegated power.*—One other question concerning our basic jurisdiction over the commerce under consideration requires some discussion.  As previously stated, certain parties urge that the Congress failed to confer jurisdiction upon us to regulate a part of such commerce by the very definition of the term "interstate commerce," itself.  That term as defined in part II of the act is as follows:

The term "interstate commerce" means commerce between any place in a State and any place in another State or between places in the same State through

71 M. C. C.

LLMC DIGITAL

another State, *whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water.*   [Italics added.]

At first blush this argument might appear to have merit.   Under close scrutiny, however, it obviously must fail in this proceeding both procedurally and as a matter of law.   In the first place, in order to rest a decision on the ground which is urged, it must be assumed that the commerce involved would be *interstate* if tested against the conventional definition thereof.   Having firmly found under the conventional and broad scope of this term, as it has been construed by this Commission, that such commerce is *not* interstate, the issues do not here reach a point where such commerce need be tested under a definition which theoretically might be more narrow.   Since, however, under the findings herein, it probably is not impossible for shippers to utilize pipelines and motor carriers in through interstate movements, the merits of the issue deserve some exploration, and a ruling should not be rested solely on the foregoing technical ground.

The expressed purpose of the parties relying on this point is as follows:

This brief and the intervention in this proceeding is filed for the purpose of removing altogether from the field of controversy the character of transportation performed by motor vehicles wholly within the confines of a single State, * * * *and put beyond doubt the authority of States and their right to regulate the for-hire transportation* of petroleum and petroleum products where the motor vehicle transportation involved is between points in a single State although there is or will be a prior or subsequent movement by pipeline.   [Italics added.]

The entire argument assumes, as it must, that the transportation involved is *interstate*, but that Congress failed to delegate the regulation thereof to this Commission.   If this were valid, then this Commission has been wrong in regulating certain motor transportation performed prior to a *subsequent* pipeline movement; the several States and this Commission have been wrong in recognizing the instant transportation as intrastate commerce and the States wrong in regulating it as such; identical motor movements following pipeline and water terminal storage would require two different forms of regulatory treatment; and what is probably more important than all the rest, movements following pipeline terminal storage would be left in a regulatory void.   For while it is true that the several States may regulate *interstate* carriers for the purpose of safety, and may extract highway maintenance fees, and require that they be identified, they may not, even in the absence of delegated Federal power, regulate and limit the number of such carriers on the basis of the public need.   Compare *Buck* v. *Kuykendall*, 267 U. S. 307, and *Lloyd A. Fry Roofing Co.* v. *Wood*, 344 U. S. 157, and the many other cases cited therein.   Thus, a grant of the relief sought would produce a result clearly not

71 M. C. C.

LLMC DIGITAL

intended even by the proponents thereof, and no party to the proceeding has speculated on the mischief which might be inherent in such a conclusion.

This Commission has long construed the definition of "interstate commerce" as contained in part II as being without limitation in the respect which is urged. The parties make no reference to the legislative history of the act to suggest any congressional intent to limit the definition, and an examination of the legislative documents fails to disclose any such intent. In fact, where mention thereof was made in the congressional discussions, it seems clear that the spokesmen considered the scope of the legislation to embrace the constitutional definition of "interstate commerce." As has been so frequently stated, since the act is remedial in its purpose it must be construed liberally, and exceptions from its sweep must be construed strictly. See *Piedmont & N. Ry. Co.* v. *Interstate Commerce Commission*, 286 U. S. 299. The construction sought which would turn on a congressional limitation of our delegated powers is without merit.

*Proportional rates and transit provisions.*—The character of that traffic having a motor movement within a single State from terminal storage which was preceded by an interstate pipeline movement under Local and Proportional Tariff No. 11, I. C. C. No. 17 of the Southeastern Pipeline Company, although a moot issue because that tariff has been canceled, nevertheless requires a brief comment.

Contrary to the implication in *Petroleum Carrier Corp. Common Carrier Application, supra*, the facts of record herein establish that the pipeline had not made arrangements with motor carriers so as to perfect a through interstate transportation within the State of Georgia. This does not mean that the establishment of appropriate transit provisions or through-route arrangements may not play a significant part in effecting a through interstate service. See *Baltimore & O. R. Co.* v. *United States*, 24 F. Supp. 734. The facts of record here, however, concerning the intent of the shipper, the terminal storage, and the subsequent distribution do not differ materially from those in *Atlantic Coast Line R. Co.* v. *Standard Oil Co.*, *supra*, and we agree with the ultimate conclusions of the examiner that the findings in the *Petroleum Carrier* case were premised on assumptions which now have been shown to be incorrect. The applicant in that case was a party to this proceeding, and the examiner's report afforded that carrier an opportunity to respond thereto on exceptions or by appropriate prayer therein to seek a further hearing if it desired to submit additional evidence bearing on the interstate question. Since no pleading has been filed in response to such invitation there is no procedural impediment to our conclusions herein. The conclusions in the *Petroleum Carrier* case are overruled to the extent that they suggest that on the facts therein

71 M. C. C.

LLMC DIGITAL

a subsequent movement by motor carrier is necessarily converted into interstate commerece.

*Motor movements preceded by a rail or motor movement.*—As noted earlier herein, the petroleum shippers who offered evidence in this proceeding were not aware of any significant movement of petroleum products by motor carrier following a prior interstate movement by rail or motor in which such products moved into storage for distibution within a single State, and no substantial evidence with respect thereto was introduced. To the extent that such handling might be practiced, however, and the characteristics of such practices accord with the criteria discussed herein, there appears to be no reason why such criteria should not be determinative of the character of the commerce.

### FINDINGS

We find under the criteria discussed herein and the factual presentation concerning the shipment, storage and distribution, of petroleum and petroleum products, (1) that the transportation by motor carrier within a single State, of such commodities, in tank vehicles, which have a prior movement by pipeline and water from an origin in a different State is, as ordinarily performed, a movement in intrastate commerce and not within the jurisdiction of this Commission; (2) that the conclusions reached herein, except as indicated below, require no modification of the treatment which the Commission has generally accorded such transportation; and (3) that the conclusions in No. MC–63517 (Sub-No. 8), *Petroleum Carrier Corp. Common Carrier Application,* 48 M. C. C. 719, to the extent that they are inconsistent with the discussion contained herein be, and they are hereby overruled.

An order will be entered discontinuing the investigation.

71 M. C. C.

LLMC DIGITAL