**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JAMES FINN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:13-cv-862** |
| | ) | **Judge Aleta A. Trauger** |
| **v.** | ) | |
| | ) | |
| **DEAN TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Defendant,** | ) | |

<u>**MEMORANDUM**</u>

Pending before the court are cross-motions for summary judgment. Defendant Dean

Transportation, Inc. ("DTI") has filed a Motion for Summary Judgment (Docket No. 32), to

which the plaintiff, James Finn, has filed a Response in opposition (Docket No. 34), and DTI

filed a Reply (Docket No. 39).[1] Finn has also filed a Motion for Partial Summary Judgment

(Docket No. 25), to which DTI has filed a Response in opposition (Docket No. 36). For the

reasons stated herein, DTI's motion will be granted, Finn's motion will be denied, and this case

will be dismissed.

<u>**BACKGROUND**</u>

**I.  <u>Overview</u>**

During the time frame relevant to this case, Finn was employed by DTI and performed

work related to the distribution of Purity-brand dairy products and other liquid food products in

the Nashville area. During this time, DTI classified Finn as a supervisor, but Finn assumed

increasing responsibility to cover for his subordinates by driving their delivery routes.

---

[1] DTI filed a Memorandum in support of its motion (Docket No. 26), which was incorrectly
docketed as a pending "motion." The court will direct the Clerk to term that docket entry.

1

In his Complaint, Finn contends that DTI violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, by failing to pay him overtime and forcing him to work off the clock for time he spent driving these delivery routes. To prove that DTI violated the FLSA, Finn must prove that (1) DTI improperly classified him as an exempt administrative or executive employee under the FLSA, and (2) Finn's delivery work was *not* subject to the so-called "Motor Carrier Act" exemption ("the MCA exemption") to the FLSA. As explained herein, the undisputed facts establish that the MCA exemption applied to Finn's delivery work.

## II. <u>Facts</u>[2]

Because the undisputed facts establish that the MCA exemption applies as a matter of law, the court will limit its summary to the facts most relevant to that issue.

### A. The Purity and Dean Entities

Purity Dairies ("Purity") is a Nashville-based dairy that sells milk, ice cream, and a variety of other perishable, liquid food items, including orange juice and tea. Purity was founded by Miles Ezell in 1926. The Ezell family owned Purity until 1998, when it sold Purity to an entity affiliated with the Dean family.

[2] In support of its Motion for Summary Judgment, DTI filed a Statement of Undisputed Facts in Support of Motion for Summary Judgment (Docket No. 27), to which Finn filed a Response (Docket No. 35). In support of his own Motion for Summary Judgment, Finn filed a Statement of Undisputed Material Facts (Docket No. 31), to which DTI filed a Response (Docket No. 37) and a Statement of Additional Undisputed Facts (*id.*) that mirrors the statement of facts it filed in support of its own Motion for Summary Judgment, and to which Finn filed an identical Response (Docket No. 38). The court's summary of the facts is drawn from these submissions, in light of the parties' respective objections thereto, and from materials in the record, including, *inter alia*, affidavits and deposition excerpts. *See* Fed. R. Civ. 56(c)(3). The pertinent facts are largely undisputed.

As it stands today, Purity Dairies is a division of Dean Holding Company, which is a subsidiary of the Dean Foods Company (which is headquartered in Texas). Dean Foods Company, through its Purity Dairies division, still produces a line of dairy goods branded as "Purity," which are manufactured and packaged exclusively in Nashville. Purity distributes its own products at warehousing and distribution centers in Tennessee, Alabama, and Kentucky. Purity also manufactures products that are sold under its customers' labels and branded as such. Furthermore, Purity distributes a limited amount of branded products from other manufacturers. With respect to Nashville-area sales, Purity once made home delivery sales, but now its business is limited to wholesale delivery for resale, or limited cash and carry sales from a back dock to Nashville individuals or businesses who do not qualify for a route. As described herein, approximately 10% of the goods Purity sells in the Nashville area are produced outside of Tennessee by entities other than Purity, at least half of which are shipped to its Nashville facility on company-owned trucks.

Dean Dairy Holdings, LLC (d/b/a "Purity Dairies LLC") ("DDHC") owns and operates a dairy facility in Nashville, Tennessee, at which Purity products are refrigerated until they can be delivered to customers. This refrigerated facility is known as "the Cooler."[3]

---

[3] There are some discrepancies in the record as to who owns "the Cooler." Roger Roberts, DTI's Division Logistics Manager, states that DTI uses its own trucks . . . to ship products made out of state to "its [*i.e.*, DTI's] Nashville temporary refrigerated storage facility." (*See* Docket No. 27, Ex. 4.) Mark Ezell, General Manager of the Purity Dairies Division of the Dean Foods Company, avers both that (1) DDHC owns and operates a "dairy facility" in Nashville "at which products are refrigerated until they can be delivered to customers", and (2) "Defendant [*i.e.*, DTI] uses its own trucks . . . to ship products to its [*i.e.*, DTI's] Nashville temporary storage facility ("the Cooler")." In Fact No. 3 of DTI's Statement of Undisputed Facts (which Finn does not dispute), DTI states that "Dean Dairy Holdings, LLC owns and operates a facility" in Nashville "at which Purity products are refrigerated until they can be delivered to customers ("the Cooler")." (*See* Docket No. 35 at Fact. No. 3.) In DTI's principal brief in support of its Motion

Purity's Nashville operations are divided between the "ice cream" operation, which sells and distributes frozen ice cream and similar dairy products, and the "milk" operation, which distributes liquid milk and other liquid dairy products to retail customers (such as grocery stores and convenience stores), schools, and restaurants in the Nashville area. All sales from Purity's Nashville branch (and the associated deliveries from the Cooler) take place within Tennessee.

DTI (DDHC's wholly owned subsidiary) owns a fleet of refrigerated trucks, which are commercial motor vehicles ("CMV") that weigh in excess of 10,001 pounds. DTI uses these trucks to deliver dairy products from the Cooler to DTI's customers.[4] Before delivering Purity products to these customers, DTI enters into agreements to supply the customers' needs for Purity products.[5] All of DTI's Nashville delivery routes start and finish at the Nashville facility,

---

for Summary Judgment, DTI states that, once DTI takes ownership of products at the point of manufacture, it ships them to Nashville, where "they are maintained in the cooler, *which is owned by Defendant's corporate parent*, and shipped to their final destination on DTI's vehicles." (Docket No. 26 at p. 5-6 (emphasis added).) As written, these representations are inconsistent. Although the distinction is not material to the court's analysis, the court will assume that DDHC (DTI's parent) owns the Cooler, which appears to be the best construction of the record. Regardless, it is clear that the Cooler was maintained by a "Dean"-related entity.

[4] Unfortunately, the parties have not been careful about delineating among the various Dean entities (including defendant DTI) and the "Purity" division of Dean Holdings Company. They seem to use "Purity" interchangeably to mean, at different times, the Purity Division of Dean Holdings Company, DDHC, and DTI. Some of the discrepancies are not reconcilable, but they seem to stem from the interrelated and integrated nature of the "Dean" family of companies. The court's summary presents its best understanding of the parties' representations. At any rate, the parties do not raise any dispute about how they have characterized references to "Purity" in different contexts within the record, nor do they argue that any distinctions would be material to the pending motions.

[5] Finn quibbles with DTI's characterization of DTI's contractual relationship with its customers. (*See* Docket No. 35 at p. 3, Response to Fact No. 9.) First, the court agrees that the cited portion of the Finn deposition is irrelevant to the fact asserted. However, the unrebutted Ezell declaration states as follows: "Before delivering its products to these customers, Purity enters

are less than 100 miles in radius from the Nashville facility, and are driven within the State of Tennessee.

All of the products that DTI delivers to its customers are perishable, although the expiration dates vary by product and product size. Purity milk, which is manufactured within Tennessee, expires within 18 days. Out-of-state products sold by Purity within Tennessee include Milo's tea (three to four weeks), orange juice (one month), fruit drinks (four to six weeks), butter (six to twelve months), water (minimum of one year). Purity markets itself as a company that provides fresh products. (*See* Docket No. 27, Ex. 6, Martin Dep. at 158:1-12 (repeating twice that "freshness is our number one selling point").) In support of this "selling point," DTI's general practice is to buy back from its customers any product that it sold to the customer that remains on the shelf (*i.e.*, unsold) as of four days before each product's expiration date. As one deponent explained, "[w]e don't want anybody getting a bad product." (Martin Dep. at 158:8.) Product that is bought back for this reason, known as "returned" product, is destroyed. Because DTI takes a loss on all returned products, it attempts to minimize its returns. At the time Finn worked for DTI, DTI planned its distributions to minimize the amount of returned product to no more than 1.25% of sales. Also, less than 1.25% of products in the Cooler go out of date before they can be delivered to a customer. Incidentally, it appears that Dean later upped its maximum target threshold for returned product to 1.5% of sales.

---

into agreements with them to supply all of their needs for Purity products. For example, our agreement with a grocery store customer is to keep the refrigerated store shelves that we have been allotted stocked with all of the Purity products that the store can sell." (Ezell Decl. ¶ 6.) Although the declaration does not state that the stores order specific types of Purity products, it does establish that DTI is responsible for keeping allocated shelves stocked with Purity products to keep pace with sales.

DTI sells products manufactured both within, and outside of, Tennessee. It appears that DTI sells a total of 261 different products, 134 of which are branded "Purity." With respect to the 134 Purity-branded products that DTI distributes, 13 are manufactured outside of Tennessee, including Purity half-and-half, custard, and buttermilk, which are manufactured in Alabama or Kentucky. The balance of Purity products that DTI purchases and distributes, including Purity milk, are manufactured within Tennessee. As to products manufactured by entities outside of the "Dean" corporate family, DTI purchases and distributes some goods manufactured within Tennessee (products branded Market Pantry, Mayfield, Horizon Organic, Yoplait, and Over the Moon) and some goods manufactured outside of Tennessee (Tropicana orange juice, Envy fruit drinks, and Milo's tea). Of the 261 products that are sold and distributed by the Purity operation, 32 are manufactured outside of Tennessee.

Of the fluid products that DTI delivered to its customers in the Nashville area, the following percentages of product were manufactured outside Tennessee:

2010 (relevant portion of year): 10.17%

2011: 10.64%

2012: 11.52%

2013 (first eight months of year): 9.17%

In other words, during the relevant time frame, Purity's sales of goods that were manufactured out of state (whether manufactured by Purity or by a third party) accounted for, on average, approximately 10% of Purity's sales volume for the Nashville branch. (*See* Docket No. 27, Ex. 7, Attachment B.) In other words, on average, approximately 10% of the products that DTI drivers delivered to DTI's customers were manufactured outside of Tennessee during the relevant time frame.

With respect to products manufactured outside Tennessee, DTI orders the products based on historical sales/order history and forecasts of customers' aggregated cumulative needs. Thus, DTI's purchases reflect aggregate estimates as to what its customers will need and are not made in response to demands by particular customers for a particular quantity of product. DTI maintains a limited inventory of goods because all of its products have expiration dates.

DTI does not alter or repackage any of the goods it obtains from outside of Tennessee. When DTI purchases goods from out of state, it ships the goods to Nashville on DTI-owned vehicles or non-DTI-owned vehicles. DTI uses its own trucks, operated by its employees, to ship most of the products made out of state to the Cooler. (*See* Docket No. 27, Ex. 4, Roger Roberts Decl. ¶ 5). In the minority of cases in which it does not use its own trucks for shipment, DTI contracts with a third-party carrier to transport these products from out-of-state manufacturers to its Nashville facility. With respect to the purchase of products from out-of-state manufacturers, DTI owns the products throughout their shipment from the location of the out-of-state manufacturer to the Nashville facility. (*See* Roberts Decl. ¶ 6; Ezell Decl. ¶ 8.) DTI pays all shipping costs associated with shipping out-of-state product to Nashville. Once out-of-state products are delivered to the Cooler, the turnover of out-of-state products in the Cooler varies by product and by day.[6] In general, DTI keeps a limited inventory of goods at the Cooler at any given time, because all of its products have expiration dates.

_____

[6] The plaintiff makes a valid point that, as worded, the Roberts Declaration speaks to the turnover rates as of the date that Roberts signed his declaration. Thus, at least as of June 9, 2014, DTI had only one day of supply of Milo's Sweet Tea in gallon size and two days of supply of Milo's Sweet Tea 20-ounce size, three days of supply of Tropicana orange juice, and approximately eight days of supply on average of the remaining out-of-state products.

DTI uses the SERTI automated inventory control system to track all products received by lot number and expiration date. This system allows DTI to know precisely what product is in the Cooler at any given time. When DTI purchases products from out-of-state manufacturers, DTI intends to sell those products to a Nashville-area customer with whom it has a pre-existing relationship.[7]

DTI's drivers run regular routes in which they visit set customers.[8] The route drivers endeavor to predict the product that will sell in light of the customer's history, the amount of shelf space, and the expiration date of the products. The route drivers begin their days at the terminal by loading the inventory that has been pulled for them, obtaining route paperwork, and getting their truck ready for the route. The average route is 11 to 12 hours long if the driver is experienced. Upon arrival at a customer site, the driver will enter the store, survey the amount of Dean product on the shelf, pull expired products, and re-stock the store with fresh products.

In addition to the transportation and distribution of goods from the Cooler, the Nashville operation maintains an inoperable refrigerated truck that is permanently parked at the Nashville facility. This truck cools product that is sold to companies that retrieve product directly from the Nashville terminal. Most sales from this truck are to food trucks or retailers who do not buy sufficient product to justify a route. The employee who handles back dock sales to customers that retrieve it from the Nashville facility is a non-exempt, hourly employee eligible for

---

[7] Again, the court understands that, when DTI purchases products from out-of-state manufacturers, DTI does not know which specific customer will receive a specific carton of tea, for example. The purchases are based on objective forecasts of customer needs, not pre-designated orders.

[8] With respect to Finn, the specific customers that Finn visited as a substitute driver depended upon the person for whom he substituted and the corresponding route that person drove.

overtime. DTI uses the internal accounting convention of tracking products sold off the back dock by including them within a designation called "Route 31." In addition to products sold off the back dock, Route 31 accounts for sales of product to other dairies, including Barber, Mayfield, and Land-O-Sun. In 2012, the oldest year for which DTI has data available, sales made off the back dock constituted .56% of all DTI's Nashville-area sales, and .45% of all sales of out-of-state product in the Nashville area. In the first two trimesters of 2013, back dock sales constituted .5% of Nashville area sales and .34% of all sales out-of-state product in the Nashville area.

The parties engage in a substantial debate about whether, and to what extent, the DOT has authority to regulate DTI's "Purity" drivers. Finn concedes, as he must, that "[a]ll commercial vehicles and those licensed to drive commercial vehicles are regulated by the DOT to a certain extent." (Docket No. 37, Ex. 6 at Fact No. 13.) DTI drivers must have a Class B Commercial Driver's License ("CDL") to operate DTI's refrigerated delivery vehicles, because they may be called upon to drive a CMV at any time. DTI's DOT registration number is 714483. Driver supervisors also have CDLs. Although some Purity products are transported to other branches via over-the-road trucks for wider distribution, the products delivered within the Nashville area come from the Nashville plant and are transported by Department of Transportation ("DOT") Class B rated trucks – not Class A over-the-road trucks. DTI's drivers are required to have an annual physical, for which DTI pays. Also, DTI, as the owner and operator of commercial vehicles, is subject to DOT audits, and its vehicles can be stopped for inspection at any time. Roger Roberts, DTI's Division Logistics Manager who is responsible for Purity transportation, estimates that DTI is audited every seven years. DTI does not have any regular reporting obligation to DOT for its delivery trucks, although DTI is required to retain

maintenance records for vehicles and CDL records.  Roberts does not recall a DTI vehicle having

a roadside audit in the last year.  Rusty Temple, a route supervisor who has been a commercial

driver for 30 years, has never been subjected to a roadside audit.  Although Finn erroneously

contends otherwise, route sales drivers are required to comply with DOT hours of service

requirements.[9]

Finn worked at Purity (and its successor entities) for 28 years, first as a route sales driver

and most recently as a supervisor of route sales drivers in Nashville commencing August of

2010.  Finn resigned his employment at Purity effective June 7, 2013.  During this time frame,

DTI classified Finn as an exempt employee under the FLSA's executive and administrative

exemptions.  Although the parties engage in substantial debate about the nature of the changes in

Finn's work as supervisor and the reasons for those changes, suffice it to say that, during this

time frame, Finn increasingly had to cover delivery routes for his subordinates.  By the time he

resigned, Finn was spending at least 50% of his time (and perhaps much more) covering delivery

routes.

## RULE 56 STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue

of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the

plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that

---

[9] Finn contends that route sales drivers are not required to comply with DOT hours of service
requirements. In the Analysis section of this opinion, the court addresses why Finn's argument is
incorrect as a matter of law and, at any rate, is beside the point.

there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th

Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In evaluating the

evidence, the court must draw all inferences in the light most favorable to the non-moving

party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the

party's proof must be more than "merely colorable."  *Anderson*, 477 U.S. 242, at 252.  An issue

of fact is "genuine" only if a reasonable jury could find for the non-moving party.  *Moldowan*,

578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

"On cross-motions for summary judgment, the court must evaluate each party's motion

on its own merits, taking care in each instance to draw all reasonable inferences against the party

whose motion is under consideration."  *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir.

2012) (internal quotation marks and brackets omitted).

Here, even drawing all reasonable inferences in Finn's favor, DTI is entitled to summary

judgment because the MCA exemption applies.  Therefore, the court's resolution of DTI's

Motion for Summary Judgment, which involves construing the facts in the light most favorable

to Finn, necessarily resolves Finn's cross-Motion for Summary Judgment.

## <u>ANALYSIS</u>

For Finn to prevail on his FLSA claim, Finn must show that (1) DTI improperly

classified him as an exempt administrative or executive employee, and (2) Finn's work driving

trucks for DTI was subject to the FLSA (*i.e.*, it was not exempt).  As explained herein, the

undisputed facts establish that, even if Finn should not have been classified as an exempt

administrative or executive employee, Finn's delivery work was exempt from the FLSA under

the MCA exemption.  Therefore, for purposes of the court's analysis of the MCA exemption, the

court will assume, without deciding, that Finn was not subject to the administrative and

executive exemptions.

## I.  FLSA and the MCA Exemption

Subject to certain enumerated exceptions, the FLSA requires covered employers to pay

overtime wages to employees who work more than 40 hours per week.  *See* 29 U.S.C. § 207.

One of these exemptions, commonly referred to as the "Motor Carrier Act exemption," is

contained in FLSA § 13(b)(1).  *See* 29 U.S.C. § 213(b)(1).  Under the MCA exemption, the

FLSA's wage and hour provisions do not apply to "any employee with respect to whom the

Secretary of Transportation *has power* to establish qualifications and maximum hours of service"

under the MCA, 49 U.S.C. § 31502.  (emphasis added.)  By its express terms, the MCA

exemption set forth in FLSA § 13(b)(1) applies if the Secretary has the "power" to regulate a

particular employee under the MCA, regardless of whether the Secretary has actually exercised

that power.  *See Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410 (6th Cir. 1970) ("If appellees

are within the [Secretary's] power, as defined in the MCA, they are exempted from the

maximum hours provisions of the FLSA and not entitled to recover overtime."); *see also Baez v.*

*Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181 n.2 (11th Cir. 1991) (citing *Galbraith v.*

*Gulf Oil Corp.*, 413 F.2d 941, 944 n.4 (5th Cir. 1969)).  As set forth in 29 C.F.R. § 782.1:

> It is settled . . . that the applicability of the exemption to an employee otherwise
> entitled to the benefits of the Fair Labor Standards Act is determined exclusively
> by the existence of the power conferred under section 204 of the Motor Carrier

Act to establish qualifications and maximum hours of service with respect to him. *It is not material whether such qualifications and maximum hours of service have actually been established by the Secretary of Transportation; the controlling consideration is whether the employee comes within his [the Secretary's] power to do so.* The exemption is not operative in the absence of such power, but an employee with respect to whom the Secretary of Transportation has such power is excluded, automatically, from the benefits of section 7 of the Fair Labor Standards Act.

(emphasis added).[10]

"The MCA in turn gives the Secretary of Transportation the authority to regulate the hours of an employee (1) who works for a private motor carrier that provides transportation in interstate commerce and (2) whose work activities affect the safety of that motor carrier." *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 904 (6th Cir. 2002) (internal quotation omitted); 49 U.S.C. § 31502. Here, Finn does not dispute that DTI is a "motor private carrier," which is an entity that transports property belonging to the carrier that is being transported for sale. *See* 49 U.S.C. § 13102(15). However, Finn argues that, when he covered delivery routes,

_____

[10] The Supreme Court's opinion in *Levinson v. Spector Motor Serv.*, 330 U.S. 649 (1947), provides background concerning the MCA exemption. The original version of the MCA was enacted in 1935, after most, but not all, states had begun regulating the safety of operation of motor vehicle carriers, many of whom were moving goods across state lines. *Id.* at 658. Among other things, the MCA granted the Interstate Commerce Commission ("ICC") the power to establish reasonable requirements related to qualifications, maximum hours of service, equipment safety, and safety of operations. The FLSA was enacted in 1938 – three years after the MCA had gone into effect. In an effort to avoid a conflict between the statutes (and regulations promulgated by the separate agencies responsible for administering each statute), the FLSA exempted from its mandatory overtime provisions any employees whose work was already subject to the power of the Interstate Commerce Commission (later, the Secretary of Transportation) to regulate under the MCA. As the Supreme Court recognized in *Levinson*, this essentially meant that Congress could change the scope of the MCA exemption by amending the MCA, as Congress did in 1942 when it expanded the jurisdiction of the ICC under the MCA, which "thereby restricted, to a corresponding degree, the application of the compulsory overtime provisions of the Fair Labor Standards Act." *Id.* at 659.

he was not engaged in "interstate commerce" for purposes of the MCA. *See Baird*, 425 F.2d at 410 ("[T]he . . . [Secretary] has the power to establish qualifications and maximum hours of service for truck drivers only if they are engaged in 'interstate commerce' for purposes of the [MCA] . . . .").

## II. <u>The Appropriate Standard for Evaluating the Scope of the MCA</u>

In *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388 (1960), the Supreme Court considered whether a particular business fell within the FLSA's exemption for certain retail sales and service establishments. The Court held that "*these exemptions* are to be narrowly construed against the employers seeking to assert them and their application limited to *those establishments* plainly and unmistakably within their terms and spirit." *Id.* at 392 (emphases added). In *Auer v. Robbins*, 519 U.S. 452 (1997), the Supreme Court considered whether an employee was a "bona fide executive, administrative, or professional employee" under the FLSA. In a section discussing whether the Secretary of Labor's construction of the exemption was entitled to deference, the Court stated that the principle articulated in *Kanowsky* "is a rule governing judicial interpretation of statutes and regulations, not a limitation on the Secretary's power to resolve ambiguities in his own regulations." *Auer*, 519 U.S. at 462-63.

Following *Auer*, several courts, including this one, have articulated this same principle with respect to construing the MCA exemption to the FLSA. *See, e.g.*, *Foreman*, 950 F. Supp. 2d 958, 964 (M.D. Tenn. 2013), *order vacated in part on reconsideration by* 2013 WL 5675899 (M.D. Tenn. Oct. 18, 2013). However, as DTI persuasively argues here, that principle should not apply to cases involving the MCA exemption. Like the FLSA, the MCA is itself a remedial statute intended to provide for the safety of the public. In *Levinson v. Spector Motor Serv.*, 330

U.S. 649, 661-62 (1947), the Supreme Court construed the scope of the MCA as an exemption to

FLSA.  In its opinion, the Court stated as follows:

> [I]t is important to recognize that, by virtue of the unique provisions of § 13(b)(1)
> of the [FLSA], we are not dealing with an exception to the Act which is to be
> measured by regulations which Congress has authorized to be made by the
> Administrator of the Wage and Hour Division . . . . Instead, we are dealing here
> with the interpretation of the scope of the safety program of the Interstate
> Commerce Commission [later, the DOT], under § 204 of the Motor Carrier Act,
> which in turn is to be interpreted in the light of the regulations made by the
> Interstate Commerce Commission pursuant to that Act.  Congress, in the [FLSA],
> does not attempt to impinge upon the scope of the Interstate Commerce
> Commission safety program.  It accepts that program as expressive of a pre-
> existing congressionally approved project.  Section 13(b)(1) of the Fair Labor
> Standards Act thus requires that we interpret the scope of § 204 of the Motor
> Carrier Act in accordance with the purposes of the Motor Carrier Act and the
> regulations issued pursuant to it.  It is only to the extent that the Interstate
> Commerce Commission does not have the power to establish qualifications and
> maximum hours of service pursuant to said § 204, that the subsequent [FLSA] has
> been made applicable or its Administrator has been given congressional authority
> to act.  This interpretation puts safety first, as did Congress.

*Id*. at 676-77.  The Court emphasized that its duty was "to give full effect to the safety program

[under the MCA] to which Congress has attached primary importance, even to the corresponding

exclusion by Congress of certain employees from the benefit of the compulsory overtime pay

provisions of the Fair Labor Standards Act."  *Id.* at 661.

As at least one court within the Sixth Circuit has recognized, the import of *Levinson* is

that "[t]he FLSA language setting forth the motor carrier exemption is only an acknowledgement

that the Department of Labor's jurisdiction yields to that of the DOT."  *Barlow v. Logos

Logistics, Inc.*, --- F. Supp. 2d --- , 2014 WL 3573325, at *3 (E.D. Mich. July 20, 2014); *see also

Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 946 (11th Cir. 1969) (agreeing with district court

that, like the FLSA, the MCA "is likewise a remedial statute and should also be broadly

construed"); *Rodriguez v. Pan & Plus Baking, LLC*, 2013 WL 1681839, at *2 (S.D. Fla. Apr. 17,

2013) (stating that, although exemptions from FLSA's coverage are generally construed narrowly against the employers seeking to assert them, "the Motor Carrier Act . . . is likewise a remedial statute and should also be broadly construed")  In other words, because the MCA exemption is triggered when the DOT has jurisdiction over an employee, and that jurisdiction is *not* construed narrowly, it would be incongruous to construe the MCA exemption to the FLSA "narrowly" against an employer.[11]

Nevertheless, the court does accept the proposition that the burden is on DTI to establish that the FLSA exemption applies.  *See Douglas v. Argo-Tech. Corp.*, 113 F.3d 67, 69 (6th Cir. 1997).  As explained herein, DTI has satisfied this burden.

### III.  Interstate Commerce under the MCA

The MCA incorporates a definition of interstate commerce found at 49 U.S.C. § 13501, which is another part of the U.S. Code related to the Secretary's authority to regulate motor vehicles generally.  Under § 13501, the Secretary has authority over the transportation of materials by a motor private carrier "between a place in . . . (A) a State and a place in another State; [or] (B) a State and another place in the same State through another State[.]"  *Id.* § 13501(1)(A) and (B).

The Sixth Circuit last addressed the scope of the MCA exemption in *Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410 (6th Cir. 1970).  There, the court addressed previous versions of (1) the MCA, which the court construed in light of then-existing ICC guidelines, and (2) the FLSA, which the court construed in light of then-existing DOL guidelines.  In 1957, the ICC had

---

[11] Even if the court were to construe the MCA exemption "narrowly" against DTI, it would reach the same conclusion.  As explained herein, DTI drivers transported a substantial volume of goods in interstate commerce and were unquestionably subject to the power of the DOT to regulate, which power the DOT actually exercised in certain respects.

issued industry-wide guidelines (*Ex Parte* No. MC-48) ("MC-48") (Docket No. 26, Ex. 1) to indicate when the transportation of petroleum and petroleum products by motor carriers within a single state constitutes interstate commerce, and the DOL had incorporated these guidelines into an interpretative bulletin outlining the scope of the MCA exemption. *See Baird*, 425 F.2d at 401-11. In *Baird*, the Sixth Circuit applied the principle that, "where the United States Department of Labor and the Interstate Commerce Commission construe the FLSA and the MCA consistently, their construction 'is entitled to great weight.'" *Id.* (quoting *Boutell v. Walling*, 327 U.S. 463, 471 (1946)). Because the DOL and the ICC had both essentially adopted MC-48, the court applied the criteria set forth in MC-48 to the facts at issue in *Baird*. Under MC-48, truck drivers were not engaged in "interstate commerce" under the MCA and were subject to jurisdiction of the ICA, where the following three factors are present: (1) specific orders of a specific quantity are not moved from one state through the terminal storage of a second state to a specific customer; (2) the use of the terminal storage as a local marketing facility from which products are sold or allocated; and (3) transportation in the furtherance of such distribution within a single state is specifically arranged only after the sale or allocation from storage.

Subsequent to *Baird*, in the 1980's and 1990's, the DOT "repudiated" the guidance set forth in MC-48, and several circuits upheld that repudiation. *See Advantage Tank Lines*, No. MC-C-30198, 10 I.C.C. 2d 64, 66-67 (1994) (compiling cases); *see also Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d 692, 706-708 (S.D. Ohio 2006) (discussing history of MC-48). In 1992, the ICC issued a policy statement, *Ex Parte* MC No. 207, 8 I.CC. 470 ("MC-207") (Docket No. 26, Ex. 3), detailing the factors it would consider when determining whether intrastate transportation of products manufactured out of state falls within its jurisdiction. As

17

outlined in *Musarra*, MC-207 was based on intervening decisions by the ICC, the federal courts, and the Supreme Court relating to the differences between interstate and intrastate trucking services provided within a single state. 454 F. Supp. 2d at 708.

MC-207 states as follows:

> Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. The factual basis for projecting customer demand may include, but is not limited to, historic sales in the State, actual present orders, [and] relevant market surveys of need.

Additionally, the ICC outlined the following factors as indicative of interstate intent: (1) "no processing or substantial modification of substance occurs at the warehouse or distribution facility;" (2) "while in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation"; (3) "modern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center": (4) "the shipper or consignees must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier"; (5) "the warehouse utilized is owned by the shipper"; and (6) "the shipments move through the warehouse pursuant to a storage in transit tariff provision."[12]

---

[12] The ICC also indicated that the following factors, if present, do not establish a "break" in the continuity of the passage of a good in interstate commerce that would change the interstate character of the subsequent transportation: "The shipper's lack of knowledge of the specific, ultimate destination or consignee at the time the shipment leaves its out-of-State origin; Separate bills of lading for the inbound and outbound movements instead of through bills; Storage-in-transit tariff provisions; Storage receipts issued by the warehouse distribution center; Time limitations on storage; Payment of transportation charges by warehouse or distribution center, when the shipper or consignee is ultimately billed for these charges; Routing of the outbound

In 2005, the DOL adopted MC-207 as the test for applying the MCA exemption in future matters. *See* January 11, 2005 Opinion Letter, "Intra/interstate transportation of gasoline and section 13(b)(1)", FLSA 2005-10 (citing 57 Fed. Reg. 19812, 19813 (May 8, 1992)). Thus, once again, the DOL and DOT agree on the appropriate standard for evaluating the MCA exemption.

The Sixth Circuit has never had the opportunity to revisit *Baird*. Courts that have addressed the continuing validity of *Baird*, including courts within this circuit, have concluded that courts should apply the MC-207 factors when assessing the MCA exemption, not the superseded (and effectively abrogated) MC-48 factors that the *Baird* court applied over four decades ago. *See, e.g., Musarra*, 454 F. Supp. 2d at 710; *Horn v. Digital Cable & Comms.*, 2008 WL 7137186, at *4 (N.D. Ohio June 12, 2008); *see also Billings v. Rolling Frito-Lay Sales, LP*, 413 F. Supp. 2d 817 (S.D. Tex. 2006) (collecting legal authority); *Mena v. McArthur Dairy, LLC*, 352 F. App'x 303, 306 n.2 (11th Cir. 2009) (noting that MC-48 factors in *Baird* had been "refined, if not phased out") (quoting *Int'l Bd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Interstate Commerce Comm'n*, 921 F.2d 904, 908 (9th Cir. 1990)). Here, DTI contends that MC-207 applies, whereas Finn takes no position on which standard to apply.[13]

The court agrees with *Musarra* that, "in the face of modern advancements and new shipping techniques, MC-48 is no[] longer sufficient to determine a shipper's intent accurately." *Id.* at 711. In *Baird*, the Sixth Circuit simply adopted the prevailing standard at the time (on which both the DOL and ICC agreed). However, that standard has essentially been abrogated

---

shipment by the warehouse or distribution center; A change in carriers or transportation modes at a distribution facility; Use of brokers retained by the shipper; [and] Use of a warehouse not owned by the shipper." MC-207.

[13] In fact, in briefing both motions, Finn does not directly reference any DOT/DOL standards.

and superseded by both the DOL and the DOT, which now agree that the MC-207 standard is the appropriate standard.  It is simply happenstance that the Sixth Circuit has not had the opportunity to revisit *Baird*, and there is no reason to believe that the Sixth Circuit would find that MC-48 survives only as a relic within the Sixth Circuit, where it has been otherwise universally abandoned.  Accordingly, the court will apply the MC-207 factors here. The court's approach honors the operative principle in *Baird* that, where the DOL and DOT essentially agree on the appropriate standard to assess the MCA exemption, that standard is entitled to substantial weight. There is simply no good reason to apply the MC-48 factors here.

## IV. **Application**

The court agrees with the defendants that this case is not a close call.  During the relevant time frame, DTI shipped approximately 10% of its sales volume from out of state, either in its own trucks or through common carriers.  Although DTI did not know the ultimate destination (within the Nashville area) of a particular shipment of out-of-state products into the Cooler, it based its determination of the total volume to be shipped to the Cooler on projections of customer demand based on facts, including aggregated historical sales for the Nashville area. Indeed, DTI specifically attempts to limit its returns to less than 1.5% per year.  *See Musarra*, 454 F. Supp. 2d. at 707 (finding interstate commerce element met, where defendant shipped products based on anticipated customer need); *Horn*, 2008 WL 7137186, at *4 (interstate commerce element met, where defendant determined volume of product to ship based on "a specific formula of current customer demands, projections based on the current market, and other considerations"); *Ballou*, 2006 WL 2035729, at *3 (interstate commerce element met, where defendant based shipment on "a forecasting system, including data on the manufacturer's 'inventory target,' the season of the year, retailer sales and marketing, the brewer's sales and

marketing"); *see also Mena*, 352 F. App'x at 307 (finding interstate commerce element was met under analogous method of projected customer needs).

DTI does not modify or process goods after purchasing them or after warehousing them at the Cooler. DTI controls the out-of-state products throughout their journey, generally on its own trucks or, in some instances, through a third-party carrier. Upon their arrival in Nashville, the products are maintained in the Cooler, which is owned by DTI's corporate parent.[14] Furthermore, in an effort to satisfy Food and Drug Administration regulations concerning the establishment and maintenance of inventory records (*see, e.g.*, 21 C.F.R. §§ 1.326(a) and 1.352), DTI utilizes the "SERTI" automated control system to track products by lot and expiration date. The goods that DTI transports from out of state are all perishable and bear expiration dates. Although some of those goods have relatively long expiration dates of 6 months to a year or more, at least some of the products DTI transports in interstate commerce have expiration dates of one month or less, and perhaps even much shorter than that. At any rate, DTI makes efforts to

_____

[14] Although DTI's parent, not DTI, owns the Cooler, courts have recognized that members of the same corporate family can participate in the transportation process from out of state to points within a state without breaking the chain of interstate commerce. *See, e.g.*, *See Billings*, 413 F. Supp. 2d at 821 (finding continuity of movement, where defendant and its affiliated companies retained control over the product for the entire journey from outside the state to endpoints within the state); *Musarra*, 454 F. Supp. 2d at 706 (technicians for subsidiary of DISH Network were covered by the MCA, where DISH Network shipped goods interstate to its subsidiary's distribution center and subsidiary's technicians shipped goods to parent company's designated customers); *Bilyou v. Dutchess Beer Distributors*, 300 F.3d 217, 224-25 (2d Cir. 2002) (where driver picked up empty containers from retailers and delivered them to corporate affiliate's facility in same state, driver was engaged in "interstate commerce" because his company and its affiliate intended product to be transferred out of state). At any rate, notwithstanding that principle, MC-207 indicates that the fact that another entity owns the warehouse where the products are stored does not support a finding that there was a break in the interstate character of the transportation of those products.

ensure that the goods it stocks at convenient stores are not only within their expiration dates, but at least several days short of their expiration date, to ensure freshness.

Courts in other jurisdictions that have addressed whether the MCA exemption applies to drivers for dairies that receive out-of-state product for delivery to local grocery stores and convenience stores have reached the same conclusion. *See Mena*, 352 F. App'x at 305-307; *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 673 (10th Cir. 1993); *Shew v. The Southland Corp.*, 370 F.2d 376 (5th Cir. 1966).

In the face of this convincing evidence that the MCA exemption applies, Finn makes two arguments.

First, Finn asserts that the court should impose a quantitative exception to the MCA exemption. Finn essentially argues that the court should limit the MCA to cases in which all or most of the goods carried by a motor vehicle were manufactured out of state, and that, as a consequence, the driver of a vehicle carrying about 10% of "interstate" goods (as here) is not subject to the MCA exemption. The plaintiffs do not cite any court that has declined to apply the MCA exemption on this basis. To the contrary, numerous courts that have addressed similar challenges have rejected them. *See Southland Corp. v. Shew*, 248 F. Supp. 2d 12, 15 (N.D. Tex. 1965) ("The fact that out of state [dairy products] are mixed with intrastate goods is not decisive . . . ."), *aff'd* 370 F.2d 376; *Ruiz v. Affinity Logistics Corp.*, 2006 WL 3712942, at *10 (S.D. Cal. Nov. 9, 2006) (finding that two or three percent of products moving in interstate commerce and scheduled for delivery was "clearly sufficient to trigger application of the motor carrier exception"); *Schmidt v. Peoples Tele. Union*, 138 F.2d 13, 15 (8th Cir. 1943) (the "amount or percentage of revenue derived by the employer from interstate [business] is not determinative). Furthermore, the DOL's position, as expressed in its enforcement manual, is that the proportion

of interstate goods is not relevant: "If it is known that some portion of a particular load is moving in interstate commerce, whether or not this is an identifiable portion of the load, the trip will be viewed as an interstate trip and therefore subject to the jurisdiction of the DOT." DOL Field Operations Handbook § 24c06 (dated 2/26/99).[15] Here, approximately 10% of the goods that DTI's drivers transported from the Cooler to endpoints within Nashville (during the relevant time frame) are goods that were traveling in interstate commerce. Even if there were some basis to find that the MCA exemption should not apply to *de minimis* quantities of goods traveling in interstate commerce, the quantities of interstate goods in trucks that Finn drove were appreciable, and in fact exceeded the quantities of interstate goods that other courts have found to be sufficient for application of the MCA exemption.

Second, Finn argues that the MCA exemption should not apply because, although the DOT had "some regulatory authority" over Finn's work as a driver, the issue requires a "more complex and detailed analysis than whether the individual is a commercial driver." (Docket No. 30 at p. 21.) This argument is not persuasive. As FLSA § 13(b)(1) states, the only issue is whether the DOT had the "power to establish qualifications and maximum hours of service," not whether or to what extent the DOT actually exercised that power. Finn's concession that the DOT had "some regulatory authority" over his work as a driver is, standing alone, dispositive of

---

[15] As many courts have found, although the DOL Field Operations Handbook is not binding, it provides potentially persuasive authority drawn from the regulators' judgment and experience. *See Myers v. Copper Cellar Corp.*, 192 F.3d 546, 554 (6th Cir. 1999) (DOL handbook provides "some persuasive authority, issued by the government agency responsible for enforcement of the federal wage and hour laws"); *Fazekas v. Cleveland Clinic Foundation Health Care Ventures, Inc.*, 204 F.3d 673, 677 (6th Cir. 2000) ("[T]he Supreme Court has indicated that an opinion of the Administrator of the Wage and Hour Division of the Department of Labor has persuasive value if the position of the Administrator is well-considered and well-reasoned.") (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

this issue.  (*See also* Docket No. 37, Ex. 6 at Fact No. 13 (admitting that "[a]ll commercial vehicles and those licensed to drive commercial vehicles are regulated by the DOT to a certain extent").)  Indeed, Finn admits that he was required to hold a CDL, that DTI has a DOT registration number, that DTI was subject to DOT audit, that its vehicles could be stopped for inspection at any time, and that DTI drivers were required to undergo a yearly physical (for which DTI paid).  The fact that certain longtime employees could not recall that the DOT had actually exercised its authority to audit DTI or to conduct roadside stops is irrelevant to whether the DOT had the *power* to do so, nor does it somehow obviate the fact that the DOT regulated DTI drivers in other ways.

In a related argument, Finn claims that drivers possessing a Class B CDL, as he did, are not obligated to comply with DOT hours of service requirements.  As the defendants point out, the DOT's Interstate Truck Driver's Guide to Hours of Service, FMSCA, Feb. 2013, directly contradicts Finn's assertion.  (*See* Docket No. 39, Ex. 1.)  In that guide, the DOT informs drivers that "[y]ou must follow the hours-of-service regulations if you drive a commercial motor vehicle," without making a distinction between individuals with Class A or Class B licenses.

Similarly, Finn claims that truck drivers who operate within 100 miles of their reporting location, as Finn did, are not subject to DOT regulations.  As to drivers who operate within a 100-mile radius of their reporting location, the DOT does afford companies an optional exception to certain DOT *record-keeping* obligations.  *See* FCMSA Guide at p.11 (citing 49 C.F.R. § 395.1(e)(1)). As the DOT explains, an employer need not have its drivers prepare detailed logbooks, but the employer still must follow other DOT regulations concerning its drivers, including the hours-of-service obligation to have drivers "[r]eport and return to work reporting location within 12 consecutive hours."  The fact that DTI previously declined to utilize

this limited record-keeping exception in no way establishes that the DOT did not have the power to regulate DTI's drivers. To the contrary, the exception reinforces the operative point: the DOT had the *power* to regulate Finn's conduct in transporting interstate goods in a commercial motor vehicle within 100 miles of the Cooler, and it simply has chosen to afford regulated companies (such as DTI) a limited optional exception to certain baseline DOT requirements.

The undisputed facts, even when viewed in the light most favorable to Finn, establish that the MCA exemption applies to Finn's work as a driver. Therefore, even assuming *arguendo* that Finn was not already exempt from the FLSA as an executive or administrative employee, his work as a route driver was necessarily exempt from the FLSA in any case. As a consequence, Finn cannot recover on his FLSA claim, and summary judgment in favor of DTI is warranted. The court therefore need not reach the separate question of whether Finn was appropriately classified as an exempt administrative or executive employee of DTI.

## CONCLUSION

For the reasons stated herein, DTI's Motion for Summary Judgment will be granted, Finn's Motion for Partial Summary Judgment will be denied, and Finn's claim will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge